[Crim. No. 7221. In Bank. May 21, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM LEE HARRISON, Defendant and Appellant.

624

Martin N. Pulich, Public Defender, and John D. Nunes, Chief Assistant Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, and Edward P. O'Brien, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of murder in the first degree, the jury fixing the penalty at death. Defendant was also found guilty of assault with a deadly weapon with intent to commit murder.

*Facts*: Defendant, 49 years of age, had been living in a common law relationship with Doris Ann Martin, 24 years of age, for approximately three years prior to her death on December 11, 1961. They lived in an apartment on Derby Street in Berkeley, but separated four to six weeks prior to December 11, 1961. About December 8, 1961, defendant moved to a friend's apartment in San Francisco.

At the time of the separation, Mrs. Martin returned to the apartment of her mother, Mrs. Presley, in Berkeley. Tony Martin, Mrs. Martin's 10-year-old son, also lived in Mrs. Presley's apartment.

Mrs. Martin was employed as a housekeeper in the home of Dr. Margaret Singer in Berkeley from the early part of 1959 until the time of her death. Defendant had also worked occasionally as a handyman at the home of Dr. Singer.

On December 11, 1961, Mrs. Martin was at the home of Dr. Singer until approximately 5:15 p.m. During the early afternoon of that day defendant telephoned to the Singer home and talked with Mrs. Martin for several minutes. Mrs. Martin returned to her mother's apartment about 6 p.m.

Mrs. Presley planned to go to church that evening, and Mrs. Martin offered to take her in her car. About 7:30 p.m. defendant telephoned the apartment and spoke with Mrs. Martin. At that time Mrs. Presley overheard her say, "Bill, I'm not always threatening you and calling you names." Mrs. Presley then took the telephone from Mrs. Martin and said: "Bill, I'm tired of you running over Doris. I'm going to call the police. You will get the same thing that you called her." Mrs. Presley then gave the telephone back to Mrs. Martin.

About 8 p.m. Mrs. Martin and Mrs. Presley left the apartment to go to the church. Tony preceded them by a few minutes.

Mrs. Presley's home is on Grove Street near the Ashby Avenue intersection. To the south of the apartment building, and parallel to it, there is a driveway, which leads to a parking area behind the building. Between two stores on

Ashby Avenue there is an alley or runway leading to the parking area.

When Mrs. Presley reached the front porch, she observed Tony crossing Grove Street. He first crossed Grove and then crossed Ashby to go to the liquor store at the corner of Ashby Avenue and Grove Street to buy candy before he was to go with his mother and grandmother to the church. At no time on his way to the store did he see defendant.

Mrs. Presley preceded Mrs. Martin by a few steps as they walked to the automobile, which was parked directly in front of the apartment building.

When they went down the steps, there was no one else present. When they were half way across the sidewalk, defendant stepped between Mrs. Presley and Mrs. Martin, grabbed Mrs. Martin, and with his right hand pulled out a 12-inch metal object from the left side of his body and struck at Mrs. Martin.

Both women screamed, and Mrs. Presley attempted to force defendant away from Mrs. Martin by pulling at his shoulder and beating on his back. She saw defendant move his right arm with the instrument in it and said to him, ''Bill, you are going to kill my child.'' Defendant replied, ''I'm going to kill you too.''

Defendant struck Mrs. Presley over the right eye, and she fell to the ground. After she got up and tried to push him away from Mrs. Martin, he again knocked her to the ground, injuring her left ear. She got up, walked to the porch of the apartment building, and knocked on the door of a ground floor apartment occupied by Mr. and Mrs. McConnell. They had heard screaming outside and then a beating on the door.

When Mr. McConnell opened the door, he saw Mrs. Presley with blood pouring down her face and onto her dress. He then looked outside and saw defendant near the car kneeling over Mrs. Martin with his right hand moving up and down upon her.

Mrs. McConnell looked outside and saw Mrs. Martin lying on her back on the sidewalk; defendant was standing over her with a knife in his right hand looking down at her.

Mrs. McConnell said to defendant: ''Bill, Bill, I'm so sorry. You have killed Doris.'' Defendant replied, ''That's what I intended to do.''

When defendant took a step toward the house, Mrs. Mc-

Connell went back inside. She then looked out and saw defendant walking away toward Ashby Avenue.

When defendant was arrested, Officer Rumford said to him, "I think you have killed the girl." Defendant replied: "I meant to kill her. I hope I got the other one too." He later stated that he had intended to kill both women.

*Questions*: First. *Did the trial court commit prejudicial error by admitting into evidence seven colored transparencies of the body, and the wounds upon the body, of Mrs. Martin?*

*No.* ■ Whether the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion. (*People* v. *Darling,* 58 Cal.2d 15, 21 [6, 7] [22 Cal.Rptr. 484, 372 P.2d 316] ; *People* v. *Brubaker,* 53 Cal. 2d 37, 48 [11] [346 P.2d 8] ; *People* v. *Carter,* 48 Cal.2d 737, 751 [11] [312 P.2d 665].)

■ Seven colored slides depicting the wounds on the body of the murder victim were admitted into evidence during the testimony of Dr. George Loquvan, an autopsy surgeon, who was called as the first witness for the prosecution. During the examination of this witness the slides were projected onto the screen and used to illustrate and clarify the doctor's testimony.

Over objection, the trial judge admitted them into evidence for the limited purpose of illustrating the testimony of the surgeon and as circumstantial evidence of defendant's state of mind as that state of mind had a bearing on his motive and intent.

The court advised the jury concerning the limited purpose for which the slides had been admitted, repeatedly admonished the jurors to consider them for no other purpose, and cautioned them not to allow their emotions to control or to play any part in their deliberations.

A review of the record demonstrates conclusively that the trial court acted quite properly, and well within its discretion, in admitting these slides into evidence.

■ Contrary to defendant's contention, necessity is not the test for determining the admissibility at trial of photographs of a murder victim. The test is whether the evidence is relevant, and in determining the relevancy the trial court is to weigh and balance the probative value of the pictures as against their possible prejudicial effect. (*People* v. *Darling,*

*supra,* 58 Cal.2d 15, 21 [7].) ▮▮▮ The trial court's determination to admit the slides here in issue was a proper exercise of this discretion.

▮ In addition to illustrating and clarifying the surgeon's testimony, the slides were also competent circumstantial evidence of defendant's malice. The element of malice was graphically pointed up by the nature and number of the wounds, in particular the multiple linear abrasions above the major 4-inch laceration on the victim's neck, indicating a sawing action or repeated attempts to incise the neck.

Likewise, there is no merit in defendant's contention that the use of seven colored slides amounted to the use of an excessive number of scenes. (See *People* v. *Brommel,* 56 Cal.2d 629, 635 [6] [15 Cal.Rptr. 909, 364 P.2d 845].)

▮ Similarly, defendant's contention that it was prejudicial to permit presentation of the slides to the jury at the very outset of the trial is unsound. Such timing was not prejudicial. In fact, it was in defendant's favor, as it is more reasonable to conclude that since the slides were viewed by the jury at the farthest point in time from their deliberations, memory would have had more time to dissipate any inflammatory effect which they might have had.

Second. *Did the trial court commit prejudicial error in allowing the prosecution to introduce certain evidence as rebuttal?*

*No.* ▮▮▮ Defendant contends that the testimony of R. W. Thaler, offered in rebuttal, was improper rebuttal evidence and that the introduction of such evidence in rebuttal so prejudiced him as to result in a miscarriage of justice. His special objection is to the testimony of Mr. Thaler that early in 1961 he had sold People's Exhibit No. 1, a knife, to Mrs. Martin and had personally delivered it to defendant the following day.

The introduction of rebuttal testimony is governed by section 1093 of the Penal Code, which provides, in subdivision 4, that after the prosecution evidence and the defense evidence have been offered, the parties may offer only rebutting testimony unless the court for good reason, in furtherance of justice, permits the parties to offer evidence upon their original case.

▮ We have held that rebuttal evidence is "restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions

that were not implicit in his denial of guilt." (*People* v. *Carter, supra,* 48 Cal.2d 737, 753-754 [17].)

Changes in the order of proof may be made within the sound discretion of the trial court. (*People* v. *Avery,* 35 Cal.2d 487, 491 [1] [218 P.2d 527].)

In the present case the prosecution put on a clear and convincing case before resting. The prosecution, through the testimony of Mrs. Presley, established that defendant had the knife in his possession and that he immediately pulled it out from his waist and attacked Mrs. Martin, thus establishing defendant's possession of the knife at the time of the attack.

When the prosecution rested, defendant took the stand and testified that he did not take a knife or weapon of any kind with him when he proceeded to Mrs. Presley's apartment and denied owning People's Exhibit No. 1. He further claimed that the knife belonged to Mrs. Presley, testifying that he had visited the apartment of Mrs. Presley on several occasions and had seen two butcher knives in the kitchen and that he had seen either People's Exhibit No. 1 or a knife similar to it in the silverware drawer of Mrs. Presley's kitchen.

On cross-examination, defendant stated that he had two butcher knives at his Derby Street apartment, but that neither of them looked like People's Exhibit No. 1. He stated that he had purchased one at a store and received the other from a janitorial company. When asked if he had picked up some knives from Mr. Thaler in early 1961, defendant denied doing so, although he admitted that he had picked up some clothing from him.

In addition to presenting defendant's testimony, the defense called Mrs. Gilmore, who testified that she had visited defendant's Derby Street apartment on several occasions and had eaten meals there. She also stated that she had never seen People's Exhibit No. 1 in defendant's apartment.

While it is improper for the prosecutor to withhold evidence which is properly a part of his case in chief and offer it after the defense has closed its case, such evidence may be used by the prosecutor where it comes within the rules of impeachment and may be admitted on rebuttal to meet evidence upon a point put into dispute by the testimony for the defense. (*People* v. *Pike,* 58 Cal.2d 70, 92 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Mayfield,* 196 Cal.App.2d 72, 75 [4] [16 Cal.Rptr. 261].)

■ Although evidence of prior ownership of People's Exhibit No. 1 was not essential to the case in chief, later developments in the case made the introduction of such evidence admissible and proper for a just determination of the issues. The court properly and within its discretion permitted the introduction of such evidence in rebuttal. This is particularly true since such evidence was in contradiction of evidence offered by defendant which there was previously no occasion to contradict. (*People* v. *Nye,* 38 Cal.2d 34, 39 [5] [237 P.2d 1]; *People* v. *Marino,* 176 Cal.App.2d 163, 166 [2] [1 Cal. Rptr. 302].)

*People* v. *Rodriguez,* 58 Cal.App.2d 415 [136 P.2d 626], relied on by defendant, has no application to the present case, as in that case the prosecution withheld a full and detailed confession of the defendant.

*People* v. *Castro,* 182 Cal.App.2d 255 [5 Cal.Rptr. 906], is also distinguishable, as in that case, which was a trial on the issue of insanity, the prosecutor withheld a prior felony conviction and an expert opinion on insanity.

Third. *Did the trial court properly instruct the jury on the doctrine of lying in wait?*

Yes. ■ The court gave several instructions on lying in wait. There is no claim that such instructions were inaccurate, but defendant contends that there was no evidence of lying in wait and that the instructions should not have been given.

This contention is incorrect. Mrs. Presley testified that when she and Mrs. Martin were walking down the steps of the apartment house onto the sidewalk, there was no one else present. It was dark, and she did not see defendant until they were on the sidewalk, when defendant suddenly stepped between her and Mrs. Martin and started attacking Mrs. Martin.

Next to the apartment building is a driveway leading to a parking area behind the building, which is accessible from Ashby Avenue by a connecting alleyway.

Accordingly, the jury could reasonably have inferred that the killer was in hiding, as no one saw him before the murder, and that he was waiting for Mrs. Martin, as he immediately attacked her when she left the apartment house.

■ The law is established that lying in wait is sufficiently shown by proof of concealment and watchful waiting. (*People* v. *Rosoto,* 58 Cal.2d 304, 355 [48] [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Byrd,* 42 Cal.2d 200, 209 [266 P.2d

505]; *People* v. *Sutic,* 41 Cal.2d 483, 492 [5] [261 P.2d 241].)

*People* v. *Merkouris,* 46 Cal.2d 540 [297 P.2d 999], is factually distinguishable from the present case. In the cited case the court found that the lying in wait was not the means through which the defendant accomplished his homicide, since the killing did not occur until two days after the watchful waiting.

From the evidence that defendant had armed himself with a butcher knife, that he was not observed on the street prior to the attack, and that he attacked Mrs. Martin immediately upon her emergence from the apartment house, the jury could reasonably conclude that he was waiting for her with the intention of killing or inflicting injury upon her, and that the killing was accomplished by the means of his watching and waiting in concealment.

Fourth. *Did the trial court err in refusing to instruct the jury as follows?*

*"I caution you that vengeance and retribution are no longer the primary objectives of the criminal law, and penalty should not be adjusted to the evil done without reference to the intent of the wrongdoer and the circumstances surrounding the crime. Your functions as jurors is [sic] not that of advocate for any party, or for the relatives of any party, in this case. Further, it is your duty objectively to bring to bear the conscience of the entire community which you will represent in your deliberations on the issue of punishment."*

*"I have endeavored in these instructions to provide you with a full understanding of your responsibilities in the determination of punishment in this case and have in no manner, intended to circumscribe or limit your absolute freedom of choice in this matter. The sole purpose of the instructions is to guide the exercise of your discretion towards a rational, fair, and objective determination of the issue.*

*"If, at the end of your deliberations in this matter, you are unable to arrive at a conscientious determination of which of the two alternatives best represents a just punishment in this case, you should not arbitrarily select the greater penalty but, rather, your uncertainty should weigh in favor of the imposition of life imprisonment.*

*"I emphasize that your decision should not be arbitrary but rather should be dictated by a fair consideration of all of the evidence and the reasonable interests of the State, of the accused, and of the entire community."*

*No*. The trial court instructed the jury thus: ". . . the only question before you in this trial is what punishment should be imposed on the defendant. In determining which punishment shall be imposed, you are entirely free to act according to your own judgment and absolute discretion.

"Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of a penalty, but, rather commits the whole matter of determining which of the two penalties shall be fixed to the judgment, the conscience and the discretion of the jury, and in the determination of that matter the jury must agree unanimously as to which of the two penalties shall be imposed.

"In this determination you will consider all of the evidence, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty which have been presented to you here in court, weighing and considering the evidence under the applicable rules of law which are given you in the instructions of the court.

"It is your duty to conscientiously consider all of the evidence in the case in arriving at your decision and verdict as to the penalty. Your verdict must express the individual opinion of each juror.

"  .    .    .    .    .    .    .    .    .    .    .    .

"With respect to the penalty, no burden of proof is cast upon the People or the defendant to show, by any particular amount of evidence which penalty should be imposed by you. Beyond prescribing the two alternative penalties, the law itself provides no standard for your guidance in the selection of the punishment.

"The law provides equally the two penalties of death or life imprisonment, but neither penalty attaches automatically, or at all until the jury unanimously agree upon their choice of punishment and designate it in their verdict.

"There is no rule of law which suggests that the punishment should be death unless there is evidence of extenuating or mitigating circumstances, nor does the law suggest that the penalty should be life imprisonment unless there is evidence in aggravation of the offense. Murder of the first degree is, in its very nature an aggravated offense, one of the most serious known to the law. Hence, it carries with it the most serious punishments known to the law, death or life imprisonment.

"You should understand that it is your duty to conscientiously consider all of the evidence, including the prior history of the defendant as proved in this case in arriving at your decision, but that it is not essential to your choice of either penalty that you find mitigating circumstances on the one hand, or evidence in aggravation of the offense on the other.

"Insofar as selecting the penalty is concerned, as between the two alternatives, the law does not itself prescribe nor authorize the Court to innovate any rules circumscribing the exercise of your discretion, but rather commits the whole matter of its exercise to the judgment and the conscience of the jury.

"In deciding the question whether the accused should be put to death or sentenced to imprisonment for life it is within your discretion alone to determine, each for yourself how far you will accord weight to the considerations of the several objectives of punishment, of the protection of society, of the desirability of stern retribution, or of sympathy or clemency, of age, sex, human passion, ignorance or weakness, or provocation not sufficient to reduce the degree or class of the crime, or of the presumption concerning life imprisonment, or possible uncertainties attaching thereto, or of the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever which appears to you to be important in the light of the evidence, the duty you owe to the accused and to the State and the law as I have explained it to you."

■■■ To the extent that defendant's proposed instructions informed the jury that they should decide the punishment on a consideration of all the evidence, the circumstances surrounding the crime, and defendant's background, such matters were adequately covered in the court's instructions to the jury.

■■■ To the extent that the proposed instructions intimate that the jury must reach such decision in accordance with the community conscience, they are incorrect. The verdict must express the individual conscience of each juror. This court in *People* v. *Howk,* 56 Cal.2d 687, 698-699 [16 Cal. Rptr. 370, 365 P.2d 426], approved this instruction: " 'Insofar as selecting the penalty is concerned, as between the two alternatives, the law does not itself prescribe, nor authorize the Court to innovate, any rule circumscribing the exercise

of your discretion, but, rather, commits the whole matter of its exercise to the judgment and consciences of the jury.' "

■ To the extent that they would have required the jury to select the alternative of life imprisonment rather than death, defendant's proposed instructions were incorrect. In California the law provides for two possible penalties against a defendant after conviction of first degree murder—execution or life imprisonment. (Pen. Code, § 190.) This court has enunciated the principle that the law neither favors nor disfavors either one of these two penalties, but that the proper penalty to be assessed depends on the evaluation which the jury places on the crime and what they feel is the proper penalty to be assessed in the particular case. This is exactly what the trial court in this case told the jury in his instructions.

The applicable rule is stated in *People* v. *Purvis,* 56 Cal.2d 93, 96 [13 Cal.Rptr. 801, 362 P.2d 713], where this court said: "The court properly refused to give the requested instructions. The jury has absolute discretion in fixing the penalty and is not required to prefer one penalty over another. [Citations.] In evaluating the evidence the jury was bound by the instructions given as to the limited purpose for which certain evidence was admitted, but beyond that it could draw its own inferences, determine the probative weight of evidence, and select the appropriate penalty on the basis of its evaluation of the evidence."

The judgment is affirmed.

Gibson, C.J., Traynor, J., Schauer, J., Peters, J., Tobriner, J., and Peek, J., concurred.