[Crim. No. 10126.   In Bank.   Feb. 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FREDERICK
SATERFIELD, Defendant and Appellant.

Frederick Saterfield, in pro. per., and Mize, Larsh, Mize, Hubbard & Baxter and Clifford J. Baxter for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment entered pursuant to jury verdicts finding defendant guilty of two counts of first degree murder and fixing the penalty at death on each count.

Although defendant does not complain of the fact, the prosecution introduced in evidence two incriminating statements he made to the police after warnings as to his constitutional rights which complied with *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; in view of our holding in *People* v. *Rollins* (1967) *ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221], that *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], does not govern cases such as the present, tried prior to June 13, 1966, these statements were admissible. The contentions which defendant does advance, relating to the sufficiency of the evidence and instructions on one of the counts, are without merit.

Defendant was charged by information with the murder of Patricia Washington (count I) and the murder of Mary Alice Washington (count II). It was also alleged he had suffered a prior conviction of murder in this state. Defendant entered pleas of not guilty and admitted the prior conviction.

Shortly after 8 a.m. on November 26, 1965, an emergency telephone call for the police was received by the Santa Ana

operator. The voice was that of a young female. She was crying, and said, "Give me the police, please." The telephone was then hung up; the operator kept the line open, but no further sounds were heard. The operator then traced the call, obtaining the customer's name and address. She called the number back, but there was no answer. She then contacted the police and turned over the information she had obtained.

In response to radio instructions, two police officers proceeded to the address from which the telephone call had originated. Receiving no answer to their knock on the front door, the officers entered through a half-open door at the side of the garage. They checked several empty bedrooms at the back of the house, calling out to learn if anyone was at home. In the kitchen they found the body of a woman, Patricia Washington, lying on her back about two feet from the sink. She had been shot in the head. In the master bedroom the officers found a second body, that of Patricia's 16-year-old daughter, Mary Alice. She was sitting next to a nightstand, slumped against the wall, and had also been shot in the head. A telephone was nearby, with the receiver on its cradle. A search of the house failed to disclose any weapons.

Melanie Washington, 10-year-old daughter of Patricia, testified she awoke shortly after 8 a.m. that day. She was walking down the hallway when defendant appeared at the front door and asked to come in. At first Patricia did not want to let him in, but she finally did so. Melanie went to her brother George's room and began reading a comic book. Defendant and Patricia started talking loudly, then Patricia screamed for Mary Alice. There was a shot, and Mary Alice ran into the master bedroom and called the operator. Defendant came down the hallway and entered the bedroom with a gun in his hand. Mary Alice cried out, "Please don't, Daddy, please don't," but another shot rang out.

George Washington, Jr., 14-year-old son of Patricia, testified he awoke that morning to hear his sister Mary Alice crying, "Please don't, please don't, Daddy, don't," followed by a shot. Defendant then walked past his room and told the other children to get dressed because he was taking them to their grandmother's house in Los Angeles. George remained where he was until defendant had gone out the front door, then ran to the kitchen and saw his mother's body on the floor. He found his sister's body in the bedroom, and saw blood flowing from the side of her neck. He ran out through the garage; defendant was standing in front of the

house, and told George to get into the car. George thought he saw defendant pointing a gun.

When all the children were in the car, defendant drove to pick up another son of Patricia, James Washington, who was staying overnight at the house of Mrs. Eloise Rocca. From there he drove them to their grandmother's house in Los Angeles, stopping on the way to buy hamburgers and french fries.

Later that morning, Officer Brewton, one of the policemen who had discovered the bodies, returned to his patrol duties. He received a radio description of defendant and his car, a white and green Rambler station wagon. Such a vehicle drove past him, and the occupant fitted defendant's description; he was looking in the general direction of the house where the killings had taken place. The officer made a U-turn and began following the Rambler at a high rate of speed. As he came within 100 yards of the Rambler, both vehicles were traveling about 75 miles an hour. The Rambler suddenly pulled over to the curb, and defendant alighted and began walking towards some houses. He stopped when Officer Brewton ordered him to halt or he would shoot. At the officer's direction defendant returned to his car and placed his hands on the roof. The officer asked him, ''Where's the gun?'' and defendant said it was inside the car. In an immediate search of the vehicle a .32-caliber revolver was found lying on the floorboard on the driver's side.

Officer Brewton then informed defendant he was under arrest for murder, and advised him that he had the right to an attorney and the right to remain silent, and did not have to say anything about what had happened. The officer then asked, ''Fred, you understand what I'm telling you?'' and defendant acknowledged he did. On reaching the police car, a second officer advised defendant of his constitutional rights, adding a warning that anything he said might be used against him in a court of law. En route to the police station, Officer Brewton asked defendant why he had shot Patricia, and defendant replied, ''The damn bitch was always taking me for my money. She took everybody for their money.'' The officer then asked defendant why he had shot Mary Alice, and defendant replied, ''That damn bitch was the cause of most of our trouble.'' When asked if he knew the victims were dead, he said he ''figured'' they were, adding ''I did it'' and ''son of a bitch.'' The officer testified defendant spoke in a very low tone of voice and sobbed at intervals.

At the police station defendant gave a statement to Sergeant Curiale, the officer in charge of the investigation. Prior to doing so, defendant was again advised that he had the right to an attorney and to remain silent, and that anything he said could be used against him in court. Defendant then related that he had met Patricia in 1960, when she had seven children; he began living with her in a common law relationship, and another child was born. A week before the killings occurred Patricia and defendant separated, the latter moving into another house. Defendant ''stated that the reason for the incident was that she was spending all his money. He was making between $1,200 and $1,300 a month, and putting it in the bank, and that she was spending it all plus borrowing money from her true husband, her mother and her friends; that she has written bad checks in the past, and he just couldn't provide enough money for her.

''The reason for their separation was due to the fact that they had an argument regarding George Washington [i.e., Patricia's lawful husband] and this money situation.

''He stated that on Wednesday he had received a $55 unemployment check and of this money he gave her $20. He retained $20 for a battery that he needed for his car, and then stated that there was an argument regarding the $15 that was left over.

''He stated on the morning of the 25th, which was Thanksgiving Day, [Patricia] came to his home and brought him a turkey, and at that time there was another argument regarding money.

''Oh, he also stated that he did resent the fact that Mr. Washington would spend overnight at the home of his common law wife.''

Defendant was then asked by Sergeant Curiale to demonstrate how he shot Patricia. He stated she was standing by the sink, washing dishes, when an argument developed about his use of the car and their money problems; that she turned around with a butcher knife in her hand and said, ''This is what you need,'' and he replied, ''Don't go threatening me with a knife''; and that he drew his gun from his waistband, extended his arm towards her, and shot her in the head.[1]

---

[1]Sergeant Curiale and a criminalist subsequently returned to the scene of the crime to retrieve the knife mentioned by defendant, if there was one. The coroner's seal on the house was still intact. A search of the sink area adjacent to the spot where Patricia fell failed to turn up any such weapon. Then, on a range top next to an oven pan containing a

When asked why he shot Mary Alice, defendant said he "heard her on the telephone in the master bedroom . . . calling for the police." He then "proceeded from the kitchen area down the hall into the master bedroom and over the bed, with his left hand extended, cut the phone off. He then reached over and shot her." Defendant stated he did not know why he shot her, and was sorry he had done it.

Shortly thereafter defendant gave a second statement to Sergeant Curiale; again he was advised of his constitutional rights, and the statement was tape-recorded. The tape was played to the jury, and a transcript thereof was incorporated into the trial record. In this second statement defendant told substantially the same story as in the first. He also gave various explanations as to why he had a loaded gun in his waistband when he went to Patricia's house on the morning in question, saying alternatively that he thought Patricia's real husband might be home, that he intended to throw the gun into the Santa Ana River, that he was going to commit suicide, and that he did not know why he took it with him. Sergeant Curiale testified that while giving these statements defendant appeared remorseful and depressed, spoke in a monotone, and sobbed from time to time.[2]

Mrs. Rocca testified she had known Patricia and Mary Alice Washington for about five years, and had Thanksgiving dinner with them at their home on the day before the killings. That evening James Washington stayed overnight at the witness' house. About 8:30 the following morning defendant knocked on her door and said that Patricia (who was already dead) had sent him to pick up James. Mrs. Rocca replied she would awaken the boy, and allowed defendant to use her bathroom in the meanwhile. Defendant asked her what was

_____

partly consumed turkey the investigators found a towel, and under the towel was a butcher knife with its blade coated with grease. It may be noted, however, that in his testimony on the penalty phase defendant denied that the latter knife was the one Patricia allegedly pointed at him.

[2]The trial took place in February and March 1966, i.e., after the decisions in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, but before *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436, and *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]. Neither at trial nor on this appeal has defendant contended that his rights under any of those decisions were violated. Nevertheless, we have undertaken an independent review of the record in this regard; it establishes he was fully advised of his *Escobedo-Dorado* rights prior to making either statement, and manifested his understanding of the warning. The statements were therefore properly admitted in evidence. In view of the date of trial, the case is not governed by *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436. (*People* v. *Rollins* (1967) *supra,* ante, p. 681.

wrong with her car, and she told him the battery must be dead. He then offered to give her a push, but she said it would not be necessary. During this conversation defendant appeared calm, and the witness did not feel anything was wrong.

The autopsy disclosed that each victim had been shot in the left temple, the bullet traveling at a downward angle through the skull. Mary Alice's hands bore powder burns from gunfire, and a bandana worn by Patricia showed similar burns. A criminalist conducted extensive tests and concluded that in each case the gun had been fired at a distance of two to four inches from the victim. Other tests on the gun established that approximately 10 pounds of pressure were required to operate the trigger after the hammer had been manually cocked, and that approximately $17\frac{1}{4}$ pounds were required to fire the gun without cocking it. In the opinion of the ballistics expert these pressures were "rather heavy."

No affirmative defense was presented.[3]

On this appeal defendant concedes he "caused the death of two human beings." He does not challenge his conviction of committing first degree murder on count I, and admits that the issue whether he "could claim self-defense or heat of passion to mitigate the crime of killing Patricia was factual and was considered by the jurors, and the court properly instructed the jurors pertaining thereto." Instead, he advances two contentions relating to his conviction of the first degree murder of Patricia's daughter, Mary Alice.

Defendant first claims the killing of Mary Alice "was accidental and without premeditation." He argues that no motive for the killing was shown "other than the fact she was contacting the police"; that had he wished to silence all possible witnesses "he would have killed all the children" then in the house; that his rush into the master bedroom after shooting Patricia "was almost a conditioned reflex"; that

[3]The sole witness called by defendant, apparently in an effort to impeach the testimony of George Washington, Jr. as to his sister's plea to defendant not to shoot her, was a police officer who questioned the boy later that day at the Santa Ana police station. According to the officer, George stated only that he had been awakened "for some reason," and "as near as he could remember, he had heard the other children talking about what had happened, but he, himself, had not heard anything." On cross-examination, however, the officer admitted that at the time of the questioning, George and the other children were crying, and that George was "nervous" and spoke very briefly in "a low voice" that was "almost hard to hear." Finally, the officer conceded he could not say for a fact that George did *not* state he heard his sister cry out.

had he wished to prevent the telephone call he need not have approached the girl but "could have shot at her when he crossed the threshold of the bedroom door"; and that he "apparently had no animosity" towards her.

These are arguments to be made to a jury, not to an appellate court. Defendant in effect requests us to reweigh and reinterpret the evidence in a manner consistent with innocence of the crime of first degree murder. But such a determination is the function of the trier of fact; at this stage the test is not whether the evidence may be reconciled with innocence, but whether there is substantial evidence in the record on appeal to warrant the inference of guilt drawn by the trier below. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382], and cases cited.)

It is settled that "To establish the crime of first degree murder, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine." (*People* v. *Cartier* (1960) 54 Cal.2d 300, 305-306 [5 Cal.Rptr. 573, 353 P.2d 53]; accord, *People* v. *Quicke* (1964) 61 Cal.2d 155, 158 [37 Cal.Rptr. 617, 390 P.2d 393]; *People* v. *Cole* (1956) 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435].)

In the case at bar there was evidence from which the jury could reasonably have found that defendant appeared at Patricia's door on the morning of the crimes with a loaded revolver in his possession; that after shooting Patricia he heard Mary Alice attempting to call the police, and determined to stop her; that he entered the master bedroom with the gun in his hand, and hung up the telephone she was using; that she pleaded for her life, crying "Please don't, Daddy, please don't," but he shot her in the head at close range; and that he appeared calm when he arrived at a witness' house shortly thereafter. From these facts the jury could reasonably have inferred that the murder of Mary Alice was deliberate and premeditated within the meaning of Penal Code section 189. (Cf. *People* v. *Hillery* (1965) *supra,* 62 Cal.2d 692, 704-705.)

Defendant's second contention is that the court erred in limiting the jury's consideration of the manslaughter instructions to count I, i.e., the charge of murdering Patricia. That

limitation, defendant argues, "was tantamount to" instructing the jury to return a verdict of first degree in the murder of Mary Alice. The argument is untenable, for the jury could still have found that murder to be of the second degree. The court gave complete instructions on both counts, concerning the definitions of first and second degree murder, deliberation, premeditation, and malice; the jurors were also told their verdict on the question of degree had to be unanimous, and that if they were convinced beyond a reasonable doubt that the crime was murder but entertained such a doubt as to whether it was of the first or second degree, they were bound to give defendant the benefit of that doubt and return a verdict of second degree.

Full instructions on manslaughter were also given, but the court expressly limited the jury's consideration of them to the count charging the murder of Patricia. It has been held that it is automatically prejudicial error to refuse to give such instructions "if there is any evidence of manslaughter deserving of consideration." (*People* v. *Modesto* (1963) 59 Cal.2d 722, 727 [31 Cal.Rptr. 225, 382 P.2d 33].)     In the case at bar, however, there was no evidence from which the jury could have inferred that the killing of Mary Alice was manslaughter. As noted above, no defense was offered on the guilt phase,[4] and nothing in the People's evidence would permit an inference of manslaughter on any theory of Mary Alice's death. In such circumstances it was not error to limit the manslaughter instructions to the other count of the prosecution. (Cf. *People* v. *Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8].)

Defendant does not challenge the proceedings on the penalty phase. We have nevertheless reviewed the record of those proceedings, and find no error.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied April 5, 1967.

---

[4]There is testimony of defendant in the record that the killing of Mary Alice was an accident resulting from a struggle for his gun. That testimony, however, was given during the penalty phase and accordingly was not before the jurors at the time of their deliberations on the degrees of guilt.