[Crim. No. 11399.   In Bank.   Apr. 17, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JERRY LEE GOODRIDGE, Defendant and Appellant.

Jeremiah Casselman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

THE COURT.—A jury found defendant guilty of first degree murder and fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

*Facts*: The deceased, Danna Gay Scheibler, was alive at 5:30 p.m. on October 28, 1966, when her mother-in-law called to pick up Danna's children to care for them while Danna worked from 6 p.m. to midnight. The following evening the elder Mrs. Scheibler returned, found the house locked, looked through the front window and saw Danna lying "like a rag doll" on the floor. There were stab wounds in her back, and blood had run down her back, her arms, and around her body. Sheriff's officers were summoned and gained entry by breaking the lock on the door.

The deceased was lying face down in the center of the living room, nude except for a housecoat that had been pulled over her head and halfway up her arms. There was a large pool of blood under her head and blood on the soles of her feet. There were two knife blades, a table knife blade and a butcher knife blade approximately 7 inches long, on the floor about 4 feet from her head.

The living room showed signs of a struggle. The coffee table

appeared to have been knocked against the couch. One piece of a broken plastic trash container lid was under a leg of the coffee table, another piece was next to the deceased's left arm. There were spots of blood on the television set and on the wall behind it. A pair of torn panties and a black negligee were found near the deceased's legs. A slip was also found near the body.

A drain pipe in the laundry area of the kitchen had what appeared to be blood on it. The kitchen telephone had been broken from its cord, and there was a red spot on the cord. The officers found an unlighted, regular-size Lucky Strike cigarette among some debris on the floor and another on the kitchen table. A cigarette butt of another brand was also found on the table. In the bathroom, spots resembling blood were found on a damp towel, the wash basin, and the soap.

Dr. Thomas Noguchi of the Los Angeles County Coroner's Office performed an autopsy on the deceased on October 30, 1966. Death was caused by severe contusions of the head and stab wounds of the chest, with resulting hemorrhage. The deceased's blood was type A. Her face was severely swollen and bruised, and there were a number of cuts on the inside of the lips corresponding to the outline of the teeth. Dr. Noguchi expressed the opinion that the cuts resulted from a blunt force created by an object with a flat surface, such as a hand or fist. The bruises were caused by a relatively flat object, either padded or smooth, and were consistent with force delivered by a foot wearing a canvas shoe. The edge of the right ear was torn. The area of hemorrhage extended from the forehead to the right side of the head, completely encircling the rear of the head. The skull was not fractured, which was consistent with the exertion of force from a foot wearing a canvas shoe.

Dr. Noguchi counted 107 stab wounds over the entire body, 54 of which were in the abdomen. Eight of these wounds were severe. Eleven wounds were found in the area of the neck, two of which were stab wounds, and at least one of these wounds would have been fatal. The windpipe was severed.

An opaque mucous fluid containing acid phosphatase, produced by male ejaculation, was removed from the vagina and anus of the deceased. A test of the fluid removed from the vagina indicated that the deceased had had sexual intercourse within less than 24 hours of death. This intercourse could have occurred at the time of death or even after death. The anal ring was open, despite the fact that it usually is closed after death, and in Dr. Noguchi's opinion an act of sodomy

had been performed either shortly before or after death.

James Scheibler, the deceased's husband, was in Seattle at the time of the murder and returned on October 30, 1966. In searching his house with the police he discovered that his wife's purse and two knives were missing. James Scheibler had known defendant for seven or eight years. Defendant had helped the Scheiblers move into their home four or five months before the murder. Mr. Scheibler had seen defendant the day before he left for Seattle, on or about October 7 or 8, and had told defendant he was going there.

The investigating officers asked Mr. Scheibler for the names and addresses of all the people with whom he and his wife had been friendly, and on the morning of November 3, 1966, he mentioned defendant's name to the officers, who went to defendant's home at 2:25 p.m. on that date. At that point in the investigation the officers had interviewed from 75 to 100 people.

Sergeant Thornton knocked on the door and when defendant answered the officers informed him that they were from the sheriff's office and were investigating the death of Danna Scheibler and had information that he was a personal friend. Defendant invited the officers into his home. They observed a 2-inch cut across his right palm, a 1-inch scar on the right side of his nose, two scars across his right temple, a scar on his left temple, and scratches on his inner left arm.

Defendant stated that he expected to see the officers, inasmuch as they probably had found his fingerprints inside the Scheiblers' home when he helped them move in. (No fingerprints of defendant had, in fact, been discovered at the Scheibler home.) He accounted for his whereabouts at the time of the murder in such a way as to afford himself, in Sergeant Thornton's opinion, a complete alibi.

Defendant told the officers he had grown up with Mrs. Scheibler in Gardena, California, and had known her from 12 to 14 years. She and his wife had once worked together, their children were approximately the same age, and the two couples shared mutual interests and visited one another's homes.

Sergeant Thornton noticed that defendant had a limp, and defendant stated that he had hurt his back in connection with his employment at a steel mill. He was asked when he had last been at the Scheibler residence, and at first said it was the day he had helped them move, then corrected himself and said it was the day before Mr. Scheibler went to Seattle. At that

point defendant lighted a Lucky Strike cigarette. He appeared nervous and paced up and down.

Defendant told the officers that he and his wife had been playing cards at his sister-in-law's home on the evening of October 28, and did not get home until 3 a.m. After soaking his feet in the bathroom, he went to Huff's, a coffee shop. A middle-aged man talked to him in the coffee shop, followed him outside, and made a suggestion which defendant interpreted as a homosexual invitation. Defendant struck the man, and a fight ensued. He explained that this was how he received the scratches on his head and arms.

When defendant finished his story, Sergeant Thornton stated that he considered him a suspect in the murder. He then informed defendant of his constitutional rights: ''I told him he had the right to be represented by an attorney at all stages of the proceedings. I asked him if he understood this, and he said yes.

''I told him he had the right to be absolutely quiet, and that anything he said to us could be used in a court against him. I asked him if he understood this. He said yes.

''I advised him that he had a right to be represented by an attorney—I mean, at all stages of the proceedings, and I said, 'If you cannot afford one, that the District Attorney—that the Public Defender's Office would appoint one or we would call the Public Defender right forthwith and have an attorney present during the proceedings,' and I asked him if he understood this. He said he did.

''Q. What was the next thing?

''A. I asked him, 'Do you want to help us on this and waive your rights?' He said, 'Yes, I will waive any rights.' ''

Defendant drove Sergeants Thornton and White to the sheriff's station in his car, arriving about 4:30 p.m., while Deputy Havlovic drove the sergeants' car to pick up defendant's wife in Gardena. Defendant was placed in an interrogation room while the officers talked to his wife. They returned to the interrogation room at 7:05 p.m. and began further questioning. They told him there were loopholes in his story and that they did not believe him.

Defense counsel called Sergeant White, who testified that he accompanied Sergeant Thornton to defendant's residence. During the initial conversation, defendant smoked incessantly and was visibly nervous. The conversation began at 2:25 p.m., and they left the house about 4:20. Just prior to 3:45 p.m.,

defendant stated that he had a sex problem and had been arrested for indecent exposure. He was advised of his constitutional rights at 3:45 p.m. The officers conferred with Mrs. Goodridge at the sheriff's station from 4:50 p.m. until 6:25 p.m.

Defense counsel also called Deputy Havlovic, who testified that Sergeants Thornton and White were beginning to advise defendant of his constitutional rights when he left to pick up Mrs. Goodridge. He later took Mrs. Goodridge home from the station about 6:45 p.m. She invited him and a woman officer into the house; he searched for some clothing there; and when he returned to the station about 7:30 p.m. he reported that a colored shirt and a pair of white pants were missing from the house.

At 7:25 p.m. defendant made a confession, stating to the officers, "I did it. I had that urge. Don't tell my wife." He stated that early Saturday morning, the 29th of October, when he arrived home at approximately 4 a.m. with his wife and son after visiting relatives in Manhattan Beach he had soaked his feet in a tub of water in the bathroom; that while doing so he looked at a Playboy Magazine and observed several photographs of nude females; and that this excited him and he made up his mind to go out on the street. He told the officers, "I had a []on." He said he changed his clothes, put on a pair of white levis, a multi-colored green checked sport shirt, low-cut tennis shoes, and told his wife he was going to Huff's, a coffee shop nearby. He drove around looking for any type of woman, intending to expose himself. He was unable to locate any woman at that hour and thought about Danna Scheibler. He knew that her husband, Jim, who was his friend, was in Seattle, so he went over to her house, arriving around 5 a.m. As he got out of his car, a man came out of a house on the corner and, fearing that this man had seen him, defendant walked on down the street, waiting until the man drove off in his camper truck before he went back toward the Scheibler residence. He tried the front door but the door screen was locked. He went through the gate and walked around the house checking the windows. In the master bedroom where he knew Danna was, there was a sliding screen door and window that opened onto a patio. This window was also locked. He removed the screen on a kitchen window and attempted to open the window but was unsuccessful, and he was also unable to open the back door. He said at this time he was so excited that he couldn't hold himself back so he went

to the front porch and rang the doorbell several times. A light came on, and through the draperies he could see Danna putting on her robe. She came to the door and asked who it was. He said, ''It is Jerry.'' She asked what he wanted and he told her that he had heard from Jim and that he was sick. She let him in, and in answer to her questions, defendant said he did not know what was wrong with Jim. Danna went to the telephone in the kitchen and dialed what defendant thought was the hotel where her husband was staying in Seattle. He then said he had to ''jump her,'' because she was too large for him to handle; he strangled her and threw her down against the laundry standpipe. She fell to the floor and he stood on top of her. During the struggle she lapsed into unconsciousness and he dragged her into the front room. She started moaning and he stomped on her with his feet and kicked her. He didn't know how many times he stomped and kicked her. She again lapsed into unconsciousness and he tore off her negligee and panties. He was trying to molest her when she started moaning again. He went to the kitchen, grabbed a butcher knife from the sink and started stabbing her with it. When the blade broke, he went back into the kitchen and got a table knife. After stabbing her once with the table knife, it also broke. He obtained another butcher knife, brought it into the living room, and stabbed her repeatedly with it. Thereafter he had intercourse with her, turned her over on her face and attempted to maintain an erection to enter her rectum.

By this time it was getting light, and he got a towel, wiped off the kitchen sink and telephone, the furniture in the front room, and then went into the bathroom, washed his hands with soap and water, leaving the towel there. He then pulled the telephone from the kitchen wall. He decided to make it appear that a burglar had committed the crimes so he took Danna's purse and left.

On his way home he threw her purse, cosmetics, a butcher knife, and the knife handles of the broken knives, out of the car at various locations. When he got home he changed his clothes, took the shirt, pants, and tennis shoes he had worn to Danna's and threw them away. He later directed the sheriff's officers to the places where he had thrown the above items. Some eye shadow found by the officers was later identified by Mr. Scheibler as belonging to his wife, and he identified the butcher knife as one that was missing from his home. The levis, shirt, and one tennis shoe were found. Defendant admit-

ted wearing the shoe on the night of the crime.

A forensic chemist employed by the Los Angeles County sheriff's office went to the scene of the murder on October 29 and took samples of the stains on the knife blades, the laundry room pipe, the television set, waste basket lid, and the towel found in the bathroom. All stains were determined to be human blood. The blood on the television set, drain pipe, waste basket lid, and one of the knife blades was type A. The stains on defendant's shirt and pants were identified as human blood.

No evidence was presented by the defense at the guilt phase other than the testimony of the investigating officers on the issue of the admissibility of defendant's confession.

At the penalty phase, the prosecution offered no additional evidence. On behalf of the defense, two of defendant's sisters, a probation officer and a psychiatrist testified. Defendant was the youngest of six children and the only boy in the family. His father died when he was four years old. His mother remarried, but there was never a father and son relationship between defendant and his stepfather. He slept with one of his older sisters until he was 12 years old. Defendant was raised by his mother and sisters. He had a bad temper, and when he did not want to perform a household chore he would become angry and cry and one of his sisters would do his work for him. During such displays of temper he would throw whatever he had in his hands, pound his fists on a table, or slam a door.

Defendant was a poor student at school and was shy. When his sister tried to help him with his homework he would say he couldn't do it and throw the paper on the table. He had no confidence in himself, left school in the ninth grade, joined the Air Force at age 18, and was discharged about six months later.

Defendant had been married for five years and had a four-year-old son at the time of his trial. His sister testified that defendant's wife was a poor housekeeper and that defendant seldom had clean, ironed clothes.

According to the records of the Los Angeles County Probation Department, defendant was placed on probation following his conviction for a sex offense in 1963. Psychiatric treatment was not recommended for the reason that ''defendant . . . shows a great deal of remorse over the matter and

appears to possess a guilt feeling after revealing and discussing this matter with his wife. He feels that he is mature enough to control future sex urges and importunes the Court to give him an opportunity to demonstrate it under probationary supervision.''

Dr. Thomas J. Meyers, a psychiatrist, examined defendant for about two hours and later administered an electroencephalogram, which revealed no brain damage. He testified that defendant had a normal intelligence potential but had not been using it; he lacked both emotional and intellectual discipline and, in the doctor's opinion, had an unconscious hatred for women based on the prominent role they had played in his life. He had a mechanism within him that drove him to degrade, demean and desecrate women; whenever he saw a woman he had an impulse to rape or physically abuse her. Dr. Meyers was sure that when defendant went to Danna Scheibler's residence he wanted to rape her; he wanted to have sexual intercourse with her but could not bring himself to ask her. The reason defendant grabbed Danna around the neck was that he was aware that she was a strong girl and the only way he would be able to subdue her was to catch her by surprise. The multiple stabbings caused Dr. Meyers to believe that some of defendant's acts were impulsive, in that after he took hold of his victim he could not stop what happened thereafter. He also noted that although defendant expressed remorse for his crimes, his regret would not prevent the next act. He characterized defendant as a sociopathic personality, an egocentric rebel against society, with a low tolerance level and inability to learn by experience.

Defendant contends:

First, *that his confession was obtained in violation of the principles set forth in Miranda v. Arizona.*

There is no merit to this contention. There was ample evidence upon which the judge and jury found defendant's confession to be voluntary. The record demonstrates that the warnings required by *Miranda v. Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], were given to defendant before he was taken into custody or otherwise deprived of his freedom of action in any significant way and before he made any incriminating statements and that he knowingly waived his right to counsel.

At the time the officers went to defendant's residence at 2:25 p.m. on November 3, 1966, they were investigating an unsolved crime. They had interviewed from 75 to 100 people,

and there was nothing in their investigation that led them to defendant other than their desire to talk to any and all friends of the Scheiblers who might be able to shed some light on the murder. When Sergeant Thornton identified himself and introduced his partners, he told defendant they were investigating the death of Danna Scheibler and had information that defendant was a personal friend. Defendant said he was, and invited the officers in. He told them he was expecting them. After about half an hour, during which time defendant told them of his acquaintanceship with the Scheiblers, the officers asked what he had done over the weekend. He told them that after he came home from work he and his wife did some banking and then went to visit her sister in Manhattan Beach; they arrived there early in the evening and stayed until the early morning hours of Saturday and then went home. He left the house again, went to a coffee shop, and got into a fight. Defendant also told the officers he had once been arrested for indecent exposure.

The foregoing conversations constituted neither an accusatory process nor custodial interrogation designed to elicit incriminating statements.

A combination of circumstances—defendant's smoking the same brand of cigarettes as had been found in Danna Scheibler's kitchen, his increasing nervousness and pacing up and down, the scratches on his face, and the information that he had once been arrested for indecent exposure—caused the officers to consider him a suspect, and at that time, 3:45 in the afternoon, Sergeant Thornton advised defendant that he had a right to be represented by counsel; that if he could not afford an attorney the public defender's office would appoint counsel for him; that he had an absolute right to remain silent; and that anything he said could be used against him. He was asked if he understood what the officer had said, and he replied that he did. Sergeant Thornton then asked, "Do you want to help us on this and waive your rights?" and defendant replied, "Yes, I will waive any rights."

Defendant then drove Officers Thornton and White to the sheriff's station in his car, leaving the house about 4:20 p.m. Except for offering defendant cigarettes and coffee, the officers did not interrogate defendant until 7:05 p.m. They said they would like to hear his story again, and after he repeated it they told him there were some loopholes in it. He then said, "I did it. I had that urge. Don't tell my wife." Defendant was placed under arrest at 7:25 p.m.

In contending that he was not properly advised of his immediate right to counsel, defendant relies on Sergeant Thornton's testimony on cross-examination: "I told him he had a right to be represented by an attorney, and that if he could not afford an attorney that the Public Defender's office would appoint one for him, and that we would call one right now, *or a little while later* when he wanted one. I asked him if he understood this, and he said yes." The italicized portion of the officer's statement that he would call an attorney a little while later cannot be interpreted as a misrepresentation with respect to defendant's immediate right to counsel or an attempt to delay any possible request for such counsel until incriminating statements could be obtained. Reasonably interpreted, the officer said he would call an attorney at any time defendant wished, now or later.

Second, *that the trial court abused its discretion in admitting exhibits in evidence.*

Defendant contends that the photographs of the deceased showing the position of her body, her torn clothing, and the knife blades were prejudicial because the testimony of prosecution witnesses was sufficient to apprise the jury of the nature of the killing and that the only purpose of the exhibits was to inflame the jury.

There is no merit to this contention. The test for admissibility is whether, in the discretion of the trial court, the probative value of the exhibits outweighs their inflammatory effect. (*People* v. *Mathis,* 63 Cal.2d 416, 423 [1] [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Henderson,* 60 Cal.2d 482, 495 [11] [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Harrison,* 59 Cal.2d 622, 627 [3] [30 Cal.Rptr. 841, 381 P.2d 665].)

The trial judge, after careful consideration, overruled objections to the admission of four photographs of the murdered victim. Three of the photographs were black and white and one in color. Other than the one in color, which the trial judge found to have probative value although it was "pretty gory," the photographs were not gruesome. Two of the photographs show the position of the victim's body at the scene of the crime. The other two were morgue shots, one of the victim's bruised head and chest and one of her abdomen with numerous stab wounds. The latter two were relevant in understanding Dr. Noguchi's testimony of the nature and extent of the injuries. There was no abuse of discretion in admitting the photographs, nor was it error to admit into

evidence the knife blades and torn clothing found on the floor near the body.

Third, *that it was prejudicial error to refuse to instruct the jury on manslaughter and diminished capacity.*

■ This contention also lacks merit. No defense was offered at the guilt phase, and nothing in the People's evidence would warrant an instruction on either manslaughter or diminished capacity. (*People* v. *Bandhauer,* 66 Cal.2d 524, 528 [2] [58 Cal.Rptr. 332, 426 P.2d 900] ; *People* v. *Saterfield,* 65 Cal.2d 752, 760 [5] [56 Cal.Rptr. 338, 423 P.2d 266].) Defendant's statement to the police that he "was so excited he couldn't hold himself back" in no way constituted evidence that he lacked any of the mental states that are elements of first degree murder. (See *People* v. *Conley,* 64 Cal.2d 310, 318-319 [5] [49 Cal.Rptr. 815, 411 P.2d 911] ; *People* v. *Henderson, supra,* 60 Cal.2d 482, 490-491 [6].)

■ To the contrary, the evidence clearly shows that defendant specifically intended to rape Danna when he went to her home. He admitted that he became sexually aroused after viewing photographs of nude women in a magazine. Though he first intended to expose himself to any woman he could find on the street, not finding anyone at that hour of the morning he decided to go to Danna's house knowing that her husband was away. He tried to enter the house surreptitiously, checking all the doors and windows and removing a window screen. Finding the doors and windows locked, he eventually gained entrance by a ruse, telling Danna that he had heard from her husband that he was ill. When she attempted to telephone her husband, he seized her by surprise. After choking her into unconsciousness, he dragged her into the front room. The kicking and choking were clearly for the purpose of overcoming the victim's resistance. Failing to keep his victim unconscious long enough to accomplish sexual intercourse, defendant went to the kitchen sink for a knife and commenced stabbing her. When the knife broke during the stabbing, he got another knife and stabbed her again, and when that knife also broke he got a third knife from the kitchen. The coroner discovered 107 stab wounds on the victim's body.

The above evidence would support a finding of first degree murder either on the theory that defendant killed Danna deliberately and with premeditation or that the killing occurred during the perpetration of rape.

Fourth, *that he was deprived of effective aid of counsel in*

*violation of article I, section 13, of the California Constitution and of due process under the Fourteenth Amendment to the federal Constitution by reason of the incompetence of trial counsel.*

There is no merit to defendant's contention that his trial counsel's failure to call Dr. Meyers at the guilt phase of the trial resulted in a denial of his constitutional right to competent representation. As stated in *People* v. *Brooks,* 64 Cal.2d 130, 140 [9] [48 Cal.Rptr. 879, 410 P.2d 383], "In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings." Counsel may well have believed that it would be unwise for the jury to hear at the guilt phase that Dr. Meyers characterized defendant as a misogynist who wished to "degrade, demean, and desecrate women," in view of the fact that eight of the twelve jurors were women.

The strategy of defense counsel in reserving Dr. Meyers' testimony until the penalty phase of the trial was doubtless to place before the jury the circumstances of defendant's background in mitigation of the punishment. Based on Dr. Meyers' testimony, defense counsel argued that defendant's inability to conform to the standards which the law demands was in part due to his close association with his mother and sisters from whom he had developed an unconscious hatred for women and that persons other than defendant himself were responsible for his shortcomings.

There is no substance to defendant's argument that it is impossible to rape a dead body and therefore trial counsel should have objected to the giving of an instruction on the felony-murder doctrine. Under the felony-murder rule (Pen. Code, § 189) the killing is first degree murder if "committed in the perpetration or attempt to perpetrate" rape. Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder. (*People* v. *Quicke,* 61 Cal.2d 155, 158-159 [2] [37 Cal.Rptr. 617, 390 P.2d 393].)

There is nothing in defense counsel's conduct that shows either an "unawareness of a rule of law basic to the case" (*People* v. *Ibarra,* 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487]) or such lack of diligence or competence as to reduce the trial to a farce or sham. (*People* v. *Robillard,* 55 Cal.2d 88, 97 [7] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Wein,* 50 Cal.2d 383, 410-411 [44] [326 P.2d

457].) The record reveals that counsel made prompt and relevant objections throughout the trial. On the issue of the admissibility of defendant's confession, he vigorously cross-examined Sergeant Thornton, and additionally called Officers White and Havlovic, who accompanied Thornton to defendant's residence during the investigation of Mrs. Scheibler's murder.

Although defendant had not challenged the constitutionality of the death penalty, this court delayed filing its opinion in this case until that question was resolved in *In re Anderson,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. This court further delayed action in all pending automatic appeals to permit defendants to challenge the composition of the jury following *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. Defendant has made no claim that the jury that returned the verdict imposing the death penalty was other than an impartial one. He has written to this court stating that he wishes to have his conviction upheld and a date set for execution; that he has had a fair and just trial and requests that no one intervene further in his behalf. We denied his petition that court-appointed counsel on appeal be dismissed.

Despite defendant's avowed satisfaction with the judgment, the record has nevertheless been examined for any constitutional error in the exclusion of veniremen opposed to the death penalty. *Witherspoon* states that no prospective juror may be excused for cause unless he makes it "unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. . . ." (Original italics.) (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

Fourteen prospective jurors were excused because of their conscientious opinions with respect to the death penalty. We deem it necessary to discuss only two of these fourteen without mention of others who also might have been erroneously excused for cause.

The entire *voir dire* examination of prospective juror Doye Fannin is set out in the margin.[1] Mrs. Fannin's statement

[1] "THE COURT: Mrs. Fannin, you have been in the courtroom during these last few hours while all of these questions were put to the members of the panel by myself and counsel. Did you hear all of these questions and the answers?

"JUROR FANNIN: Yes, your Honor.

that "I cannot serve on a capital punishment case," is in the nature of a summary conclusion as to her ability to serve on the jury. It is susceptible of the interpretation that she had "general objections to the death penalty or . . . conscientious or religious scruples against its infliction." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522 [20 L.Ed.2d at p. 785].) Her answer might also mean that because of her conscientious feelings about the death penalty she would find it distressing to impose such a punishment. If Mrs. Fannin was in fact of such a disposition of mind that she would never impose the death penalty under any circumstances regardless of the evidence in the case, it is manifest that her answer gives not the slightest indication of such attitude. In short, her meager responses certainly do not unmistakably indicate that she would automatically vote against the imposition of capital punishment.[2] Unfortunately there was no further inquiry either by the court or counsel to ascertain the meaning of her answer.[3] Since the court failed to do so we cannot say that Mrs. Fannin was properly excused for cause. Rather, she appears to fall directly within the language of *Witherspoon* that, "Unless a venireman states *unambiguously* that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, *it simply cannot be assumed that that is his position.*" (Italics added.) (391 U.S. at p. 516, fn. 9 [20 L.Ed.2d at p. 781].)

The second venireman erroneously excused for cause was Mrs. Oma Freeman. She was initially examined by the court and counsel on March 13, 1967, at which time she clearly

"THE COURT: Would your answers have been different in any way to any of the questions that you can recall proposed by me or counsel?

"A. I cannot serve on a capital punishment case.

"THE COURT: Very well, Mrs. Fannin, you are excused for cause."

[2]If we look to the *voir dire* examination of veniremen examined prior to Mrs. Fannin we might be able to assume that she understood the question posed to her as being similar in form to questions posed to the prior veniremen. (See *People* v. *Varnum* (1969) *ante*, p. 480, 491-496 [75 Cal.Rptr. 161, 450 P.2d 553].) The form of question posed by the court to other veniremen was as follows: "You have a conscientious objection about imposition of the death penalty?" Even if we assume that Mrs. Fannin understood that this was the question being asked of her, we cannot say that her answer, without more, indicates adequate cause for her dismissal from the panel. We do not know what her answer means and the court's summary questioning of her failed to elicit views from her indicating the nature and extent of her objection to the death penalty.

[3]We do not intend to criticize the trial court for its failure to further question the venireman since the trial of the instant case occurred before the United States Supreme Court announced its decision in *Witherspoon*.

indicated that she understood that she had the discretion to impose the penalty of life imprisonment or of death and that if after hearing all the evidence she felt that it was a proper case for the death penalty, she would be able to vote to impose that penalty. She was not challenged for cause at that time nor was she excused by the exercise of a peremptory challenge. However, on the morning of March 14, 1967, Mrs. Freeman sent a note to the bench indicating that after much "soul-searching" she believed that she could not vote to impose the death penalty. Upon receipt of the note the court asked her whether her "conscientious objection against imposing the death penalty [was] one so strong [that] even in a proper case you would be unable to participate in a verdict imposing such a penalty?" Mrs. Freeman replied: "I really don't know. I'm on the fence. I just don't know. I have never had to make a decision like this before, and it is bothering me." The court then asked her whether she had "some doubts about it" and when she replied in the affirmative she was excused for cause.

It requires little discussion to point out that Mrs. Freeman indicated no more than that she really did not know whether she could vote to impose the death penalty and that the necessity for making a decision was bothering her. Such a response clearly does not indicate that she could never vote to impose the death penalty no matter what the facts of the case might reveal. Much more in the way of an expression of opposition to the death penalty would be required from Mrs. Freeman for us to sustain her dismissal from the jury for cause. Under the compulsion of *Witherspoon*, therefore, defendant must be given a new penalty trial.

The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

McCOMB, J.—I dissent from that portion of the opinion that reverses the judgment insofar as it relates to penalty. I would affirm the judgment in its entirety: