Filed 3/11/16  P. v. Walters CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069235 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1301746) |
| JEREMY DANIEL WALTERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jeremy Daniel Walters of first degree murder (Pen. Code,[1] §187, subd. (a)) and felon in possession of a firearm (§ 29800, subd. (a)). The jury also found the firearm enhancement allegations in the murder count to be true. The jury acquitted Walter of making criminal threats (§ 422). After a bench trial, the court found that Walters had suffered eight prison priors, one of which also constituted a strike and a serious felony prior. The court sentenced Walters to a total prison term of 93 years to life.

On appeal, Walters contends there was insufficient evidence of premeditation and deliberation to support his conviction of first degree murder, and therefore his conviction must be reduced to second degree murder.[2] We disagree because substantial evidence supports the jury's finding.

FACTUAL BACKGROUND

A. *The People's Case*

Paul Inman lived in a house in Apple Valley, California, with his family and his girlfriend, Tiffany Rust. Inman was friends with Steve Worthington, whom he had known for several years.

---

[1]    Unless otherwise indicated, all statutory references are to the Penal Code.

[2]    In his opening brief, Walters also asserted that his 2008 conviction for receiving stolen property would have been a misdemeanor if Proposition 47 had been in effect at the time of the offense, and therefore it cannot be considered a felony for purpose of a section 667.5, subdivision (b) enhancement. However, in his reply brief, Walters withdrew that argument in light of *People v. Diaz* (2015) 238 Cal.App.4th 1323.

2

In June 2013 Worthington, Kimberly Frech, Inman, and Walters were all friends. Frech had previously dated Walters for a short time.

In early June 2013 the electricity was turned off at Worthington's house. Inman owned a portable generator, which he loaned to Worthington.

On June 11, 2013, Worthington discovered the generator was gone, apparently stolen from his home. Walters had been asking about the generator the night before, so Worthington suspected that Walters stole the generator. Worthington spoke to Walters on the telephone that day about the generator, and then Worthington and Frech drove by Walters's house to look for the generator, but did not see it there.

Late in the afternoon or early evening of June 11, Worthington and Frech drove to Inman's house. Worthington parked his truck in front of the gate.

Inman was packing belongings because he was preparing to move out of the house. Inman asked Worthington if he wanted some spare motorcycle parts from his garage. Worthington, Frech, Inman, and Rust went into the detached garage behind Inman's house to look for the parts.

Inman gave Worthington a test lead, which is a wire to test voltage, and a test light, which looks like a 16-inch screwdriver made of steel and plastic. Worthington held onto the test lead and gave the test light to Frech. The group walked towards the front of the house where Inman's motorcycle was parked.

At about the same time, Walters and his girlfriend, Shannon Craddock, drove up to Inman's house. Walters knew that Worthington would be at Inman's house. Several hours before, Inman's mother called Craddock on the telephone and told her that

3

Worthington and Frech were visiting. Walters was armed with a revolver he concealed under his shirt.

Walters parked his SUV directly behind Worthington's truck, making a "T" with the two vehicles. This blocked Worthington's truck. Rust went back inside the house while Inman, Worthington, and Frech remained outside.

Walters and Craddock walked quickly up the driveway, greeted Inman, and then walked into the house. Frech was scared because she and Craddock did not get along. The two women had a "confrontation" at Worthington's house two or three days earlier. Frech feared that Craddock was going to beat her up.

Inman and Worthington continued talking and working on Inman's motorcycle while Frech stood next to them. When Walters and Craddock exited the house, Walters told Craddock to "go get her"—referring to Frech. Craddock emptied her pockets, handing her cigarettes and other belongings to Walters, and began walking very fast towards Frech, who was standing next to Inman.

Frech called out Inman's name ("Paul, Paul") and she tried to hide behind him as Craddock approached. Inman told both women, "[N]ot here."

While Inman was trying to keep Craddock apart from Frech, Walters punched Worthington in the face. Worthington took two steps back, and holding his face said, "Why did you do that for? I did not do anything to you."

Walters replied, "What do you think[,] I'm some kind of a punk?" Walters then pulled the revolver from his waist and pointed it at Worthington. Inman said, "Dude, what are you doing? Put that away." Inman had never seen Walters with a gun before.

4

Standing only a few feet away from Worthington, Walters replied, "I can't. Sorry," and Walters then shot Worthington in the face. The .38-caliber bullet entered near Worthington's left nostril, traveled through his brain to the back of the skull, and killed him instantly. Walters turned to Inman and said, "Sorry." Gunpowder residue on Worthington's face indicated that Walters shot Worthington from less than a foot away.

Frech ran into the house screaming, afraid Walters was going to kill her next. Walters went into the house and said, "[J]ust say it was a drive by."

Inman's mother told Walters to get out, and Walters and Craddock left Inman's house and drove to Walters's uncle's house, which was nearby. Walters hid his SUV in his uncle's garage.

The next morning, police arrested Walters at his cousin's home. After entering the home, officers cautiously approached Walters, who appeared to be sleeping on a living room couch. Because Walters was a murder suspect who was possibly armed, the officers grabbed Walters and pulled him down to the hardwood floor. When Walters was noncompliant, in an effort to subdue him, an officer punched Walters several times in the face. At the police station, Walters complained that the arresting officers had injured his face, head, hand, and back. In a recorded interview after his arrest, Walters stated he "didn't have no other markings" on his face before his arrest.

Police photographed the injuries Walters received during his arrest. At trial, the deputy district attorney showed some of those photographs to Walters's uncle, who, when seeing them, exclaimed, "Wow," and testified he did not see Walters with those injuries immediately after the shooting.

5

After obtaining a search warrant, police searched the home where Walters was arrested. Inside the bedroom closet, police found a box of ammunition that was missing six .38-caliber rounds. Police never located Walters's gun. Walters testified that after the shooting, he threw the gun in a vacant field near Inman's house.

B. *The Defense Case*

Walters testified in his own defense. He told the jury that he and Chaddock drove to Inman's house to help Inman's mother pack up to move. He brought the loaded gun for protection after being threatened by unnamed people who were friends with Inman and Frech. Walters testified that he always traveled armed "for protection."

Walters testified that Worthington never accused him of stealing the generator, and there was no animosity between himself and Worthington. According to Walters, he told Worthington that the generator was not stolen; rather, Inman had taken the generator back himself.

Walters testified that after he and Craddock arrived at Inman's house, Walters asked Worthington to move his truck so Walters could park closer to the house, since he was helping Inman's mother pack up to move. Frech said they would move the truck when they were ready, which started an argument between Frech and Craddock. After Walters made a sarcastic remark about Frech, Worthington repeated Frech's remark, that they would move their truck when they were ready to leave.

Next, Worthington charged towards Walters, rushing towards him. Walters took a step back and punched Worthington in the face. Walters testified, "[I]t was like he was charging me. What else was I to do?" Walters said to Worthington, "[W]hat the hell's

6

wrong with you?  What's up with that?"  As Walters was saying that, Inman came from

the side and punched Walters in the left temple.  As Walters bent over as a result of that

punch, Worthington and Inman hit him about 10 more times in the head, and then

Worthington kneed him twice in the face, breaking his teeth.[3]

Walters testified that to protect himself, he stood up, pulled the gun from his

waistband, placed his finger on the trigger and pointed it at Worthington and Inman, who

were standing about two feet away.  Worthington grabbed Walters's arm, and Walters

shot Worthington in the face.  Walters testified that he suffered numerous facial

injuries—scratches, redness, and swelling—from Worthington's and Inman's attack on

him.

DISCUSSION

I.  *SUBSTANTIAL EVIDENCE SUPPORTS THE FIRST DEGREE
MURDER CONVICTION*

Walters contends the evidence was insufficient to support the jury's finding of

premeditation and deliberation.  He asserts there was "no evidence" he came to Inman's

house "with a plan to kill Worthington."  He contends the fact that he punched

Worthington first, before shooting him, requires that any premeditation or deliberation

must have taken place "in the moment between the punch and when appellant pulled the

---

[3]     The pathologist who performed the autopsy on Worthington found blood on
Worthington's right knee and shin, which was consistent with blood having dripped from
the facial wound, not a knee injury.  Worthington had no wounds or contusions on his
arms and hands.

7

trigger without a preconceived plan."  Walters argues that even his statement, "I can't.

Sorry," shows only that he acted "on a rash impulse" and not preexisting reflection.

An appellant challenging the sufficiency of the evidence "bears an enormous

burden."  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)  It is the jury's exclusive

province to assess the credibility of the witnesses and draw reasonable inferences from

the evidence.  (*Ibid.*)  We must affirm the judgment if substantial evidence supports the

finding on premeditation and deliberation.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124

(*Perez*).)  Substantial evidence is evidence of legal significance, reasonable in nature,

credible, and of solid value.  (*Ibid.*)  One witness, if believed by the jury, is sufficient to

sustain a verdict.  (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1258-1259.)  "We

presume every fact in support of the judgment the trier of fact could have reasonably

deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier

of fact's findings, reversal of the judgment is not warranted simply because the

circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]

'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'"

(*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Review of evidence supporting a finding of premeditation and deliberation

involves consideration of the evidence presented and all logical inferences from that

evidence in light of the legal definition of premeditation and deliberation.  (*Perez, supra*,

2 Cal.4th at p. 1124.)  Deliberation refers to the actor carefully weighing considerations

in forming a course of action; premeditation means the actor thought over those

considerations in advance.  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)  The

process of premeditation and deliberation does not require any extended period of time. """The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Our Supreme Court has identified """three categories of evidence relevant to resolving the issue of premeditation and deliberation:  planning activity, motive, and manner of killing.""" (*People v. Lee* (2011) 51 Cal.4th 620, 636.)  However, "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Here, the strongest evidence of premeditation and deliberation is contained in Inman's testimony about the manner in which the shooting occurred.  As Inman testified, with no provocation, Walters punched Worthington in the face.  When Walters then drew his gun, Inman pleaded with Walters not to shoot by saying, "Dude, what are you doing? Put that away."  Walters rejected Inman's plea by saying, "I can't.  Sorry," and by shooting Worthington point-blank in the face.

Worthington was unarmed and he had made no threats.  Walters's decision to shoot Worthington in the head—despite pleas by Inman that he not do so—is substantial evidence that Walters had an opportunity to think over and weigh his course of action before acting, and that he actually deliberated and decided to kill.  (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759 [evidence was sufficient to support a finding of premeditation and deliberation where the defendant shot the victim in the head at close

9

range after rejecting pleas not to do so]; *People v. Bolin* (1998) 18 Cal.4th 297, 320 [evidence of victim's pleas for his life were particularly relevant to the issue of the defendant's premeditation].)  Moreover, the dialogue between Inman and Walters (Inman: "Put that away"; Walters: "I can't.  Sorry") shows Walters deliberated before he chose to kill.  Walters heard Inman's plea, thought about it, rejected it, and apologized for deciding to kill.

Walters contends that because he punched Worthington in the face before shooting him, "any premeditation or deliberation had to have taken place in the moment between the punch and when [Walters] pulled the trigger . . . ."  Walters's argument is incorrect.

The whole course of conduct indicated a plan to render Worthington vulnerable by first punching him in the face, and then shooting him.  "The utter lack of provocation by the victim is a strong factor supporting the conclusion that [Walters's] attack was deliberately and reflectively conceived in advance." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 (*Lunafelix*).)  In any event, even assuming, for the sake of argument, that Walters did not premeditate and deliberate about killing until after he punched Worthington, "'[t]he true test is not the duration of time as much as it is the extent of the reflection.' [Citations.] 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)  Here, *after* Walters punched Worthington, Inman pleaded with Walters to put his gun away, saying, "Dude, what are you doing?  Put that away."  Walters' response, "I can't.  Sorry," shows Walters considered what to do, and determined as a result of careful thought to kill Worthington.

10

Additional support for the finding of premeditation and deliberation is provided by the evidence of Walters's possible motive for the shooting. Earlier in the day, Worthington accused Walters of stealing Inman's generator. After Walters punched Worthington in the face, Worthington asked, "Why did you do that for?" Walters replied, "What do you think[,] I'm some kind of punk?" and then pulled the gun from his waistband. The jury could reasonably conclude that Walters was angry with Worthington for what Walters perceived as an unfair accusation of stealing Inman's generator. Anger is sufficient to establish motive, even where the motive may appear senseless. "[T]he law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient." (*Lunafelix, supra,* 168 Cal.App.3d at p. 102; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [anger as motive sufficient where defendant testified he became angry over victim's repeated refusal to sell him beer, "believ[ing they] were being rude to him," overruled on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; *People v. Arcega* (1982) 32 Cal.3d 504, 519 [defendant motivated to kill because he felt anger and frustration by what he perceived as the victim's unfair and cruel treatment of him].)

The jury could also reasonably have inferred premeditation and deliberation from the manner of killing—a point blank .38-caliber shot into Worthington's face. "'[A] close-range gunshot to the face is arguably sufficiently "particular and exacting" to permit an inference that defendant was acting according to a preconceived design.'" (*People v. Cage* (2015) 62 Cal.4th 256, 277.) "[A] close-range shooting without any

11

provocation or evidence of struggle reasonably supports an inference of premeditation and deliberation." (*Id.*, citing *People v. Thompson* (2010) 49 Cal.4th 79, 114-115.) "'[The] fact that defendant brought his loaded gun . . . to the [location] and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance.'" (*People v. Adcox* (1988) 47 Cal.3d 207, 240.)

Walters contends there was "no evidence" that he came to Inman's house with a plan to kill Worthington. However, Walters knew that Worthington was at Inman's house that day. Earlier in the day, Worthington accused Walters of stealing the generator. Walters then armed himself with a loaded gun before driving over to Inman's house. Walters contends he armed himself for protection, but the jury could reasonably reject that explanation. According to Walters, he went to Inman's house to help Inman's mother pack up to move. But there was no evidence to suggest Walters could reasonably expect to encounter a threat to his life while helping Inman's elderly mother pack. Moreover, when arriving at Inman's house, Walters parked his SUV in a manner that blocked Worthington from leaving. The jury could reasonably conclude from these facts that Walters planned to kill Worthington before arriving at Inman's house.

Additionally, a jury could have inferred from the evidence of Walters's actions after the shooting that he did not kill in self-defense, but rather was acting in the course of a premeditated killing. Immediately after shooting Worthington, Walters was already fabricating a possible defense: He told the witnesses to "say it was a drive-by," and he disposed of the gun. Walters then drove to a nearby relative's home, where he hid his

vehicle in a garage.  These actions hardly seem to reflect a person who had to kill in self-defense.

Finally, the jury reasonably rejected Walters's claim of self-defense because it was contradicted by all the relevant physical evidence.  Walters's facial injuries were caused by the arresting officers and not by Inman or Worthington.  When Walters was asked during a recorded interview whether his eye injury was sustained during his arrest, he admitted that he had "no other markings" before his arrest.  Walters's uncle exclaimed, "Wow," when shown photographs of Walters's postarrest facial injuries and testified he did not notice any such injuries when Walters was at his home immediately after the murder.  The autopsy showed that Worthington had no injuries to suggest he had been in a fight.

Even Walters's own testimony was self-contradicting.   At the end of his first day of his testimony, Walters stated he shot Worthington by accident.  Walters's attorney asked him, "And you pulled that trigger intentionally, correct?"  Walters replied, "It's hard to—no, not really.  [¶] . . . [¶] It just happened as I was pulling it back. . . .  I was tightening up and pulled the trigger at the same time I was tightening up, pulling my arm back."  Outside the jury's presence, the court asked Walters's lawyer whether the defense was accident or self-defense, stating there was a "substantial suggestion by [Walters] through his testimony that this was an accident."  The next morning when trial resumed, Walters testified he intentionally shot Worthington in self-defense, believing Worthington was trying to wrestle his gun away from him.  Walters's inability to keep

13

even his own story straight strongly supports the jury's conclusion his defense was completely fabricated.

Citing *People v. Boatman* (2013) 221 Cal.App.4th 1253, where the Court of Appeal found insufficient evidence to support a conviction for first degree murder, Walters contends that here too, the evidence does not support the jury's finding of premeditation and deliberation. However, the facts of *Boatman* are very different from those here. In *Boatman*, the defendant shot his girlfriend while they were in a bedroom of his family's home. The defendant gave different versions of what happened, all involving an accidental shooting. Immediately after the shot, the defendant attempted to give the victim mouth-to-mouth resuscitation and told his brother to call police. (*Id.* at pp. 1259-1261.) The *Boatman* court concluded there was no planning evidence presented and that the defendant's behavior after the shooting was "of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan." (*Id.* at p. 1267.)

Walters's case is unlike *Boatman*, in which there was no evidence the defendant had given any thought or consideration to killing. Instead, here, there was sufficient evidence to establish Walters had a motive to kill Worthington, planned to kill him by bringing a loaded handgun to Inman's house, pinned Worthington's vehicle so he could not escape, rendered Worthington vulnerable by first punching him in the face, rejected Inman's plea to not kill Worthington, and then fired point-blank into Worthington's face. Moreover, following the shooting, Walters did not behave like someone horrified and distraught at what he had done, but like someone who had just fulfilled a preconceived

14

plan.  Walters made no attempt to aid Worthington or summon medical assistance, but instead told witnesses to say it was a drive-by shooting, disposed of the murder weapon, fled the murder scene, and hid, first at his uncle's house, and then at his cousin's.

In sum, the evidence here of planning, motive, and method all support the jury's finding of premeditated and deliberate murder.  (See *People v. Proctor* (1992) 4 Cal.4th 499, 529 ["When the record discloses evidence in all three categories, the verdict generally will be sustained."].)

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McINTYRE, J.

IRION, J.