Filed 11/8/23  P. v. Hendrix CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B324605 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA004901) |
| v. | |
| ALTRIKEE EUGENE HENDRIX, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Allen J. Webster, Judge.  Affirmed.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendant and appellant Altrikee Eugene Hendrix appeals from the order denying his petition for resentencing pursuant to Penal Code section 1172.6, entered after an evidentiary hearing held pursuant to subdivision (d) of that statute.[1]  Defendant contends the finding that he could still be convicted of murder after amendments to sections 188 and 189 is not supported by substantial evidence.  We conclude the trial court's finding that defendant was a direct aider and abettor of the murder and thus remains guilty under current law is supported by substantial evidence and we affirm.

## BACKGROUND

In 1991, a jury convicted defendant of the first degree murder of James Dailey, first degree robbery with the use of a firearm, and two counts of second degree robbery.  His conviction was affirmed on appeal in *People v. Hendrix* (Sept. 24, 1992, B062672) (nonpub. opn.).  He was sentenced to 25 years to life plus 11 years in prison.

**Relevant 1991 trial evidence**

Sylvia Bentley was home with her mother, son, and six other children on the evening of January 21, 1990.  Dailey had been there that evening and left between 9:30 and 10:00 p.m.  At 10:05 p.m. defendant rang the doorbell.  Bentley had met defendant by the nickname "Alboo" a few months earlier through Dailey.[2]  When Bentley asked who was at the door, she heard, "It's Alboo."  Defendant then asked if Dwight (her son) was there.

---

[1]     All further unattributed code sections are to the Penal Code unless otherwise stated.

[2]     Dailey's nickname was "Speedy."

2

As Bentley unlatched the door, defendant yanked the door open and two other men ran in wearing dark clothing and ski masks with openings only for the mouth and eyes. Defendant wore dark clothing and a knit beanie around his head. Defendant directed where the other two men were to go. While one of them held a gun to Bentley's mother's head in the bedroom, the other man ran to Bentley's room and came out with her Louis Vuitton purse. He then grabbed the VCR. The men also took jewelry Bentley and her son were wearing and her driver's license. All the while defendant stood at the front door pointing a silver-colored gun at her. Bentley thought the gun looked like a nine-millimeter, but could not be sure. After they left Bentley went to tell Dailey and his mother about the robbery and to call the police, as the robbers had disabled her phone.

Earlier in the evening of January 21, 1990, between 7:00 and 9:30 p.m., Margie Owens was sitting in a car talking with friends when three men approached the car. Owens identified defendant in court as one of them. One of the men passed a thick chrome- colored gun (not a revolver) to another, who then asked for money. Owens gave them the $11 or $12 she had.

Later that night Owens was near Dailey, who she knew only as "Speedy," at the phone booths near the local 76 gas station on Imperial Highway (hereinafter the gas station). Owens saw defendant and another man standing near the gas pumps and told Speedy they were the ones who had robbed her. She again saw defendant standing with another person in front of a motel across the street from her residence. She watched them cross the street to the back of the gas station and out of sight. Owens went to the nearby market and when she returned, she

saw Dailey lying on the ground with an ambulance and police nearby.

In the early hours of January 22, Urilonda Richardson was in the vicinity of the gas station when she saw two men standing across the street. She did not see their faces. After a white car passed by and turned into the gas station, the driver (Dailey) got out and went to the telephone booth. The two men then approached the car and one got into it. Dailey tried to get his keys from the ignition, but "after they showed him ammunition," Dailey ran out into the street. The man in his car got out and shot Dailey in the head while the other man stood there. The shooter's companion tried and failed to get into the white car with the shooter but it was moving too fast. The shooter drove away in the car while his companion ran away on foot. Richardson described the shooter as having braids and the other man as wearing a black beanie. Both men wore black pants and white T-shirts, and both were dark-complected.

Another eyewitness, Bregetta Green, was at a hamburger stand on Avalon Boulevard near Imperial Highway between 1:00 and 2:00 a.m. on January 22, talking with an acquaintance. She saw two men in the back of the gas station peeking around the corner toward the front, and then she no longer saw them. She then heard a gunshot, and an unknown man ran past her. She saw the side of his face and was able to identify photograph No. 3 in a photographic lineup as resembling the man who ran past her. Later, in court she identified that man as defendant.

Viko Souchaseum, the manager of the motel at Avalon Blvd and Imperial Highway across the street from the gas station, testified that late on the night of January 21 into January 22, while on duty, he saw three men in the parking lot near the five-

4

foot wall that surrounds the motel compound. Souchaseum ordered them to leave, which they did, but two of them returned after about five minutes. When Souchaseum approached, he found only one man standing on the driveway entrance to the motel. He told the man not to come back and then returned to the office. When he came back out to see what the other two men were doing, he heard a gunshot and saw a man fall by the roadside. One man ran away. A white car turned into the gas station, stopped shortly and then drove away. When shown a photographic lineup, Souchaseum selected No. 3 as someone who very much resembled one of the men he saw that night at the motel. Souchaseum identified defendant in court as that man. The men wore black and defendant appeared to be holding a black handkerchief or small towel.

The victim's brother Argusta Dailey (Argusta) testified that he saw his brother parked at the gas station at Avalon Boulevard and Imperial Highway on January 21, 1990, where they had a short conversation. When Argusta drove up, he saw two men near the back of the station on the east side. He recognized one of them, and after speaking to his brother they walked around the gas station to check on the two men but did not find them. Argusta then put gas in his car, told Dailey he would be back after he took his wife and kids home, and left. Argusta identified defendant as one of the two men he saw at the gas station. Defendant was wearing dark-colored clothing, a dark sweatshirt, and a black beanie. When shown a photographic lineup, Argusta selected No. 3, and identified defendant in court as the person depicted in photograph No. 3.

Argusta explained that Dailey regularly used the telephone at that gas station for narcotic sales transactions as it was close to home.

On March 27, 1990, Los Angeles Police Detective Charles W. Merritt interviewed defendant at the police station regarding the murder and the robbery after defendant waived his *Miranda* rights.[3] Defendant denied the murder but admitted to the residential robbery of Bentley and the street robbery of someone the day before. He described the property taken from Bentley's home, which included some drugs and cash, and said he took $5 from a woman the day before when he did not have a gun. He admitted having a gun during the Bentley robbery but did not know what kind of guns his accomplices had.

Defendant said he knew Dailey from school and he knew Bentley was Dailey's girlfriend. Defendant had purchased rock cocaine from Dailey on occasion, which Dailey sold from Bentley's house. Defendant said he needed money to buy more drugs and support his habit, so that evening he and two accomplices decided to rob the house because they knew Dailey kept money and cocaine there. Defendant explained he did not wear a mask so Bentley would recognize him and let him in. Defendant told Detective Merritt he thought Dailey would kill him for robbing his girlfriend, and sometime after the robbery Dailey drove by his house with another person and yelled, "Alboo, you're dead."

**Section 1172.6 motion**

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437, amending the laws pertaining to felony murder and murder under the natural and probable consequences

---

[3]     See *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature also added a procedure for those convicted of murder to seek retroactive relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

In January 2019, defendant filed a petition alleging the three conditions required to show prima facie eligibility for relief under section 1172.6. Among other allegations and as relevant here, defendant alleged (1) he was charged with murder under a theory of felony murder or the natural and probable consequences doctrine, (2) he was convicted of murder, and (3) he could not presently be convicted of murder because of changes to section 188 or 189, effective January 1, 2019. (See § 1172.6, subd. (a).)

The trial court found defendant had not made a prima facie showing of eligibility for relief under section 1172.6 and summarily denied the petition. We reversed that order and remanded to the trial court with directions to appoint counsel for defendant, allow defendant to file a reply to the opposition, consider the issuance of an order to show cause, and then proceed in accordance with the statutory requirements.

In September 2021, the trial court appointed counsel for defendant, who filed a brief regarding prima facie review and requested the issuance of an order to show cause. The court continued the matter a number of times over a nine-month period, and according to the court's minutes the "prima facie hearing [was] completed" on September 28, 2022. Although the

7

court ordered the prosecution to file copies of the trial transcripts, it does not appear from this record that the trial court issued an order to show cause or received a response from the prosecutor as required by section 1172.6, subdivision (c). The matter was continued to October 4, 2022, when an evidentiary hearing pursuant to section 1172.6, subdivision (d) was held with defense counsel's implied consent.[4]

During the hearing, the trial court indicated that it had read the 1991 trial transcripts provided by the prosecution, and the parties argued the issues based upon the transcripts without presenting additional evidence. The trial court orally analyzed the issues and evidence and denied the petition upon finding beyond a reasonable doubt the evidence showed defendant would still be guilty of murder under the amended murder laws as a direct aider and abettor who acted with the intent to kill. The court also found defendant was a major participant in the crime who acted with reckless indifference to human life.

Defendant filed a timely notice of appeal from the order denying his petition.

## DISCUSSION

Defendant contends that the trial court's ruling was not supported by substantial evidence.

---

[4] At the outset of the hearing, when the court invited the prosecutor to proceed first, counsel reminded the court that "at this point, the (d)(3) . . . burden is on the People to prove beyond a reasonable doubt that [defendant] is guilty of murder under the changed law. So he has to go first."

## I. Standard of review

At the evidentiary hearing conducted pursuant to section 1172.6, subdivision (d), the trial court sits as an independent fact finder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) The court must "'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard.'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) On appeal from the denial of a petition after hearing, our task is to determine whether any rational trier of fact could have made the same determination beyond a reasonable doubt. (*People v. Vargas, supra*, at p. 951.) We apply the substantial evidence standard of review. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233-234.)

Under the usual substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)[5] "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; 'a mere possibility' or '[s]peculation is not substantial evidence [citation]." (*People v. Brooks* (2017) 3

---

[5] We base our review for substantial evidence upon the 1991 trial record not subsequent interpretations of the evidence.

Cal.5th 1, 120.)[6]  "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II.    Direct aiding and abetting murder

"Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought."  (*People v. Gentile* (2020) 10 Cal.5th 830, 848.)  A defendant is liable for murder perpetrated by an accomplice if he "'aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'"  (*In re Lopez* (2023) 14 Cal.5th 562, 585.)

---

[6]    Defendant asserts that the trial court's ruling was based on speculation and improper inferences, and that the trial court acknowledged as much when it commented "'that it had to 'deal with' 'a lot of conjecture.'"  Defendant concludes that the trial court must have accepted the prosecutor's theories, which were not supported by substantial evidence.  Defendant relies on two phrases from the reporter's transcript of the hearing, although the entirety of the court's comments make clear they were directed to the attorneys' arguments, not the court's own analysis.  The court then also made clear that it would rely upon its own evaluation of the evidence.  We thus decline defendant's invitation to review the prosecutor's arguments for substantial evidence.

Factors relevant to determining whether substantial evidence supports a finding that defendant was an aider and abettor include "'presence at the scene . . . , companionship, and conduct before and after the crime, including flight.'" (*People v. Medina* (2009) 46 Cal.4th 913, 924, quoting *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Thus the aider and abettor of murder must have shared the killer's intent to kill, and to share the actual perpetrator's intent to kill that intent must have been formed beforehand. (*People v. Williams* (1997) 16 Cal.4th 635, 676.)

Defendant challenges the inferences from which the trial court concluded defendant aided and abetted the shooter with an intent to kill. Defendant quotes the following excerpt from the court's reasoning: "'No one ever said that Mr. Hendrix was the shooter. But he ran away. And so I guess the question is: if there was no intention to kill this particular man, why did he run away? Or even more so, why would he even go to the scene if [he] was not involved in that? . . . But he went to the gas station. Why? I basically think to make sure that he killed Mr. Daily [*sic*] before Mr. Daily [*sic*] killed him. That's the only inescapable conclusion that this court can come up with beyond a reasonable doubt. He placed himself voluntarily at the scene of the shooting . . . the evidence strongly suggests beyond a reasonable doubt that he aided and abetted this particular crime.'"

11

From these statements, defendant concludes the trial court inferred intent to kill from the fact "(1) [defendant] voluntarily placed himself at the scene; [¶] (2) he knew that the decedent was out to kill him; [¶] (3) he knew his accomplices were armed; and [¶] (4) he ran away after the killing."

Defendant claims each of these inferences was unreasonable and speculative, arguing that there was no evidence defendant knew the shooter was armed or intended to kill Dailey, that the men with him at the gas station were the same men who participated in the earlier two armed robberies, or that defendant and his accomplices intended anything other than to steal the car. Quoting *In re Lynette G.* (1976) 54 Cal.App.3d.1087, 1095, defendant also asserts that flight may be explained "'by a desire merely to disassociate oneself from an unexpected criminal activity.'" It *may* be, but the court was not required to adopt that view as the substantial evidence discussed below supports a reasonable inference that defendant's flight indicated a consciousness of guilt. (See *ibid*.) Our task is to determine whether the judgment is supported by substantial evidence, not to determine whether substantial evidence supports contrary findings. (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759.) Ultimately, it is the court's ruling, not its reasoning that must be supported by substantial evidence. (See *People v. Brooks* (2017) 3 Cal.5th 1, 39.)

Considering all the circumstances of the night and early morning of January 21 and 22, the evidence yields much more than the contrary inferences suggested by defendant. All the events occurred within a period of about six hours, suggesting defendant was indeed with the same companions he knew were then armed. Defendant committed the Owens and Bentley

12

armed robberies earlier the same night as the shooting, each crime including two accomplices. Owens testified defendant and one of the robbers handled a thick chrome-colored gun that was not a revolver. Bentley testified defendant used a chrome-colored nine-millimeter gun and one of the accomplices held another gun. A nine-millimeter spent bullet casing was found at the scene of the shooting. Defendant and his two accomplices committed the Owens robbery between 7:00 and 9:30 p.m., the Bentley robbery just past 10:00 p.m., and Dailey's shouted threat was made after that. Argusta saw defendant at the gas station sometime before midnight, and other witnesses later saw defendant and two companions watching the gas station from behind the gas station and from the motel parking lot behind a five-foot wall. Dailey was killed between 1:00 and 2:00 a.m.

Having considered the totality of the circumstances, including the evidence of defendant's motive, his presence and behavior at the scene, defendant's and his companions' conduct before and after the crime, we find that substantial evidence supports the trial court's finding that defendant went to the gas station intending to either kill Dailey or that an accomplice kill Dailey. We conclude that any rational trier of fact could have determined beyond a reasonable doubt that defendant was guilty of murder as a direct aider and abettor under section 188, as amended effective January 1, 2019. We thus find no error in the denial of defendant's petition.

Defendant argues that his admission to law enforcement that he thought Dailey would kill him for robbing his girlfriend was not probative of an intent to kill. It may not be conclusive as to defendant's intent, but it did provide evidence of an "intent or purpose of committing, encouraging, or facilitating" killing Dailey

13

before Dailey could kill him, particularly in light of Dailey's threat made after the robbery, "Alboo, you're dead."

Defendant also asserts that his "mere presence at the scene of a crime" was insufficient to prove he was armed or knew the shooter was armed. The evidence showed defendant's secretive behavior with the shooter and another man at and near the gas station. The Bentley robbery and Dailey's threat took place in the evening hours of January 21, and the events that followed took place that same night during the overnight into the early morning hours of January 22 at or near the nearby gas station. Five witnesses identified defendant as one of two or three men they saw at the gas station, first near the pumps, then behind the gas station and from behind a five-foot wall at the motel across the street from the gas station. Owens saw him at the motel and later at the back of the gas station. Argusta, who knew defendant, saw him and another man at the back of the gas station, approached the area where they were seen, but did not find them. Later, Richardson saw two men in the back of the gas station peeking around the corner toward the front of the gas station, and then disappearing out of sight. When Dailey drove into the gas station alone, the shooter and his companion crossed the street and approached from the motel. Richardson then heard a gunshot and a man she identified as defendant ran past her after trying but failing to get into the car as the shooter fled. Defendant argues that there was no evidence he was accompanied by the same accomplices of the two armed robberies he committed that night at the time of the shooting. In the alternative defendant argues if he intended to aid and abet a crime, the evidence showed the only crime intended was car theft. In fact, the evidence shows Dailey may not have been *in the car*

when they approached, but he was very close, as Richardson testified that Dailey tried to get his keys from the ignition, but "after they showed him ammunition," Dailey ran out into the street. Ultimately, "[t]he focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ""'isolated bits of evidence."'"" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)

As we have determined substantial evidence supports the trial court's ruling on a direct aiding and abetting theory, we need not reach the issue whether there was sufficient evidence supporting the alternate theory of felony murder under current law. (See *People v. Clark* (2011) 52 Cal.4th 856, 1003.)

## DISPOSITION

The October 4, 2022 order denying defendant's section 1172.6 petition is affirmed.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.

15