Filed 10/23/24  P. v. Cisneros CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B325640 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA077024) |
| v. | |
| JESUS ORTEGA CISNEROS, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

The opinion herein, filed on September 25, 2024, is modified as follows:

On page 24, footnote 9 is deleted and replaced as follows:

[9]     Defendant complains the trial court never addressed the evidence of the underlying felony, robbery, and concludes he was not a major participant in the robbery because there was "no

evidence" defendant had anything to do with taking Trejo's property.  The jury found defendant guilty of the second degree robbery of Trejo beyond a reasonable doubt.  We again note that from all the circumstantial evidence arising from the night in question, we have found substantial evidence supports the conclusion defendant was an aider and abettor in the murder of Trejo.  We find no need to further discuss whether defendant was a major participant in the robbery of Trejo who acted with reckless indifference to human life.  (See *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19.)

The modification does not affect the judgment. Appellant's petition for rehearing is denied.

_____

ASHMANN GERST, Acting P. J.   CHAVEZ, J.   HOFFSTADT, J.

Filed 9/25/24  P. v. Cisneros CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESUS ORTEGA CISNEROS,<br><br>    Defendant and Appellant. | B325640<br><br>(Los Angeles County<br>Super. Ct. No. VA077024) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jesus Ortega Cisneros (defendant) appeals from the order denying his petition for resentencing, pursuant to Penal Code former section 1170.95, since renumbered section 1172.6.[1] The trial court denied the petition following an evidentiary hearing pursuant to section 1172.6, subdivision (d) upon finding the prosecution had met its burden to show beyond a reasonable doubt that defendant was not entitled to resentencing. Defendant contends the order was not supported by substantial evidence and should be reversed. We find no merit to that contention and affirm the order.

## BACKGROUND[2]

### The 2004 conviction

In 2004, defendant and codefendants Eric Fernandez, Alberto Hernandez, Armando Salmon, and Rubin Servin (collectively codefendants) were convicted of the first degree murder of Miguel Trejo (§ 187, subd. (a)), the torture of Trejo (§ 206), and second degree robbery of Trejo (§ 211). In addition defendant and codefendants were convicted of the following crimes against Alfonso Gomez: first degree robbery (§ 211), first degree burglary (§ 459), and dissuading a witness (§ 136.1, subd. (b)(1)).

In addition to finding defendant guilty of murder, the jury found true the special circumstance allegations that the murder

---

[1] All further unattributed code sections are to the Penal Code unless otherwise stated.

[2] Our summary of the procedural history is taken from *People v. Cisneros* (June 29, 2006, B179596) (nonpub. opn.), which affirmed the judgment against defendant and the codefendants on direct appeal but corrected sentences.

2

was committed during the commission of a robbery (§ 190.2, subd. (a)(17)) and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also found a principal was armed with a handgun during the commission of the crimes (§ 12022, subd. (a)(1)). As corrected on direct appeal, defendant's aggregate sentence was life in prison without the possibility of parole, plus 11 years. (*People v. Cisneros, supra*, B179596.)

**Relevant 2004 trial evidence**

At the time of his murder, Trejo was living in Alhambra with Gomez, a relative of his brother Saul Trejo's wife.[3] Saul testified the brothers spoke by phone frequently every day. The last time they spoke was about 10:00 p.m., Saturday, June 7, 2003. Trejo told his brother that he intended to go to South Gate on Sunday morning to pick up the security guard uniform Saul needed for work. Trejo said he planned to go with "Chavo," who Saul knew and identified in court as codefendant Hernandez. Saul also identified defendant in court as the man he had often seen driving a white Lexus.

Gerald Altamirano, a friend of defendant's, testified to events of June 7 and early morning hours of June 8, 2003. Altamirano knew Hernandez by the name Chavo and as defendant's friend. Altamirano also knew Salmon and had previously been to Servin's house. Altamirano first met Jose Arevalo and Fernandez on June 7, 2003.

Altamirano testified defendant had been driving a beige Lexus for a few months before and during June. Altamirano also

---

[3] We will refer to Miguel Trejo as Trejo and his brother Saul Trejo as Saul to avoid confusion. No disrespect is intended.

3

drove the Lexus sometimes. On the evening of June 7, Altamirano was with defendant when defendant received a phone call to pick up Hernandez and Trejo, whom Altamirano had seen several times previously with Hernandez and Salmon. Initially they seemed friendly. They arrived at Servin's house about 11:00 p.m., and Hernandez ordered them all out of the car. Servin opened the gate, and they went into the backyard where there was a shed and three men unknown to Altamirano. Servin closed the gate behind them, and then Trejo and Hernandez went into the shed along with defendant and the three unknown men, who seemed to go into the shed voluntarily. Altamirano remained standing next to a tree in the backyard.

From where he stood at the tree, Altamirano heard sounds coming from inside the shed of someone being punched and knocked to the floor, then he heard more punches, screaming and moaning, and duct tape being pulled from the roll. He heard Hernandez calling the victim bad words and asking in Spanish where the marijuana that had been stolen from him could be found. Altamirano recognized Trejo's voice replying in Spanish that he did not know what Hernandez was talking about.

Altamirano then heard a gunshot from inside the shed, and Salmon ran out of the shed, approached Altamirano, handed him a black gun, and said, "Hold it." When Altamirano asked whether there was something wrong with it, Salmon nodded and said he had just shot it. Altamirano put the gun in the engine compartment of a car that was in the backyard, and Salmon returned to the shed. In the meantime Fernandez, Arevalo and defendant were going in and out of the shed, but Hernandez remained inside. Once when defendant came out of the shed, he told Altamirano that they were "giving it to him," meaning Trejo,

4

and defendant asked Altamirano whether he wanted to hit Trejo. Defendant said Trejo was a "jacker" who had stolen drugs. Arevalo approached Altamirano more than once, including one time when Fernandez was with him. Arevalo seemed excited, happy, shaking his hands up and down at chest level and rubbing his open palms together.

Altamirano and others drank beer as he waited outside for about 45 minutes to an hour while Trejo was being beaten in the shed. After about a half-hour Trejo began giving information the drugs were at his uncle's house in Alhambra. Altamirano, defendant, Hernandez and Salmon then went to South Gate to pick up a van and the van's owner. When they returned to Servin's house, Hernandez went into the shed, and Altamirano heard Trejo giving directions. Hernandez came out and said, "Let's go."

Altamirano, Hernandez, Fernandez, Salmon, defendant and the van's owner went together to an apartment complex near a church in Alhambra. Upon arrival, everyone but Salmon and Altamirano got out and went to an upstairs apartment in the back. Hernandez and one of the others had guns. They returned about 20 minutes later, angry. They drove around, stopping at a gas station and then a 7-Eleven store while Hernandez spoke to Servin several times on his cell phone speaker. Hernandez told Servin Trejo was lying about the address as no one opened the door. Altamirano could hear Servin questioning Trejo, who, sounding hurt, told him it was the truth; that his uncle was there; and that he or Servin could call to confirm.

The group returned to the apartment complex, and Altamirano again stayed in the van. Salmon came back before the others, stood outside the van for several minutes, looked

5

around, and then returned upstairs when a police car drove by. They then all returned to the van with luggage that smelled of marijuana.  Hernandez said they had taken money and tied up the person inside and put a plastic bag over his head.  He said they forgot to get the pills Trejo said were in the truck under the apartment with the keys.  They stopped at a 7-Eleven store, put the guns in the back part of the van, then went to Salmon's apartment in South Gate where he and Hernandez left the bags of marijuana.  Hernandez called Servin and asked, "Is he still alive?"  Hernandez looked angry when told Trejo was alive and said he was going to finish him off.

At Servin's house Altamirano remained in the van while the others went into the backyard and out of sight.  Servin returned and backed up the van to the shed.  The van owner then said he had to leave and drove the van away.  Hernandez backed his Toyota into the yard close to the shed's door.  Altamirano could see Arevalo and everyone else in the yard except Salmon.  Servin had begun cleaning the car with a rag and then opened the trunk.  Hernandez and Servin went into the shed, then Servin ran to his house.  Hernandez called Altamirano from the door of the shed to come and help him.  Altamirano went to the shed door and saw Trejo, who looked dead.  Trejo was upside down, hands bound behind his back, with green paint on him.  His head and body were covered with blood that was also all over the floor of the shed.  Fernandez, shirtless and wearing yellow dishwashing gloves, kicked Trejo in the head.  Hernandez observed in Spanish that this is what happens to "jackers."  Altamirano refused to help with the body, and Hernandez said something like "don't be a . . . coward."

As Hernandez rolled Trejo in a blanket, Altamirano left. A minute or two later Hernandez and Fernandez brought the body out wrapped in blanket and took it to the back of the Toyota. Servin was then near the car, and defendant was near the tree with Altamirano. When a sheriff's car pulled up, they dropped the body, and Hernandez exclaimed in Spanish something about being in trouble. Everybody started running. Altamirano saw Hernandez and defendant jump a fence, and Servin run along the side of his house to the street. He also saw Miguel Valdez with two other people come through the front of the house minutes before the sheriff's car arrived.

Altamirano identified Valdez as the person arrested with him outside Servin's house, who he had not known before June 7, 2003.[4] Valdez testified Arevalo was his second cousin and a friend, Fernandez was a friend, and Servin an acquaintance.

Valdez spent the day of June 7, 2003, with Fernandez and another friend, Lucio Reyes, before they went to Servin's house later that evening. About 10:30 p.m. he saw a group of five or six people arrive in a Lexus, park and enter the backyard through the gate. Valdez heard one or two gunshots and a person screaming, "Kill me for once and for all." After 10 minutes they left when Fernandez told them to take the car and leave.

Valdez returned to Servin's house about 3:30 a.m. to get a different car and some drugs. Fernandez gave them marijuana and crack. When Servin came out talking on his phone, Valdez asked for marijuana. Servin then led Valdez to the shed where Trejo lay on the floor while Arevalo gave him water. Tied with a cable or hose around his neck with his hands behind his back,

---

[4] Valdez was given immunity in exchange for his testimony.

7

Trejo was covered in blood with a black plastic bag over his face and part of his chest. The room smelled of the paint, which was on the floor and Trejo's shoes. Servin, still on the phone, asked Trejo where to find the pills. Trejo replied they were in the van. Alone with the victim, Valdez asked Trejo why he was there. He replied, "For being an idiot," and asked Valdez to help him. Afraid he or Arevalo would get into trouble, Valdez declined. Servin returned and gave Valdez marijuana. After smoking it, they both left the shed. Valdez and Reyes then left Servin's property but returned between 6:30 or 7:00 a.m. in time for Valdez to see an Astro van leaving the yard.

When Valdez and Reyes returned, the Toyota had been moved, the trunk was open, and Fernandez, Hernandez, and defendant were gathered around it. Altamirano was in the yard, Servin was near the front gate, and Arevalo was sleeping in the garage. Valdez saw the blanket on the ground, and Fernandez told them they should leave. Valdez woke Arevalo in the garage to leave. As Valdez waited outside he saw everyone running. Arevalo said the police were there, so they went to the side of the house where they were caught and arrested.

Gomez testified Trejo was staying at his Alhambra home in June 2003. Gomez was in bed in his apartment when a man came in his bedroom pointing a gun at his head, saying, "Don't move, mother-fucker," and told Gomez to turn his face to the wall. Gomez complied but was able to identify the gunman in court as Fernandez. A folded blanket was thrown over his head, but when Gomez said he could not breath a second man, who Gomez identified as Salmon, took it off. Salmon also had a gun that he pointed at Gomez's head, clicked it once by pulling the trigger, but it did not fire. Then Salmon threw a plastic bag over

8

his head and handcuffed him, tied his feet with the phone cord, and asked where the pills were. Gomez did not know anything about pills. Gomez heard other male voices in the apartment speaking Spanish. After about 45 minutes to an hour, Salmon said, "You call the police, we come back and kill you." They then left, and Gomez managed to get himself loose. During his interview with Detective John Corina four days after the robbery, Gomez said he thought there were two other male Hispanics inside the apartment, but he did not see them.

Servin's longtime next-door neighbor testified that her bedroom was about five or six feet away from Servin's shed. On the night of June 7, 2003, she went to sleep around 11:00 p.m. and was awakened later by a man's voice saying, "Give me water, I'm burning," in Spanish. He also said, "Help," "Forgive me, my god, for what I've done," and "[U]ndo the handcuff." She also heard the man give an address in Alhambra. His voice was muffled, and he spoke with difficulty. Other men's voices from inside the shed spoke clearly. She heard, "Bring him water," "Are you going to give him water?," and "Yes."

Montano went back to sleep and woke up again at 5:00 or 6:00 a.m. After leaving for a short time, she returned and saw a white car with the trunk open, with someone cleaning it. Kicking sounds were coming from the shed along with a complaining sound, like "mm, mm." She saw several men near the car, which was close to the shed. She called the police.

Ten or 15 minutes later, there was a lot of noise near the fence and a young man came to Montano's door. When asked what he wanted, he answered, "the police." She said she wanted nothing to do with the police, and if this was a problem with the

*cholos* he should go.  She closed the door.  Though she was not certain, she testified she thought the young man was defendant.

Veronica Gutierrez testified Salmon was her former boyfriend and in June 2003 lived with her in her apartment.  Hernandez was a friend, and he and his wife stayed with them a few days during the first week of June 2003.  Hernandez and Salmon had gone out together several times in the day and evening of June 7, 2003, and early morning hours of June 8.  On June 8, around 2:30 a.m., Hernandez returned wearing different clothing—his shorts and her eight-year-old son's sweater.  Before they left again, Gutierrez retrieved from them the key to her Ford SUV.  They returned once again at approximately 3:00 or 4:00 a.m. in an Astro van with three other men.  Salmon and Hernandez had a suitcase they carried into the garage.  When the van left, only Salmon stayed behind.

Salmon, Gutierrez and her children then went to a motel where they stayed for a couple days before moving from motel to motel for about a week.  Later, Gutierrez found a security uniform and bloody clothes in a laundry bag.  When she asked Salmon about them, he took them away.  Gutierrez also found some paperwork and a cell phone in her SUV.  Salmon told her they belonged to Trejo, and he gave them away to some kids.  Salmon told Gutierrez on June 7 and 8 he had searched Trejo, took $300 from his wallet, and had shot him.

Medical examiner Darryl Garber, MD, performed the autopsy on Trejo's body.  He found extensive facial swelling, as well as bruises, contusions and lacerations on his face, extremities and torso.  A gunshot wound from a bullet that passed through the lower right leg, fracturing the tibia was observed.  Abrasions or scratches found on his neck were

consistent with a ligature type strangulation. Trejo suffered what appeared to be nine separate blows to the head from a blunt instrument with a relatively sharp edge, large enough and heavy enough to cause a straight linear cut that penetrated the full thickness of the scalp. Numerous blows resulted in additional facial swelling and bruises on the right side of Trejo's chin. On his forehead, right eyebrow and right upper cheek there were four or five linear or elongated lacerations that were almost parallel, going through the full thickness of his skin, and in some cases reaching the bone. Trejo was intoxicated at the time of his death, having ingested methamphetamine and cocaine. There was acetone in his blood and urine, which is consistent with paint thinner, most likely inhaled.

The cause of death was ligature strangulation, which occluded the blood supply to the head. Dr. Garber testified it could take several minutes of sustained compression to occlude the airway and several more minutes after a victim lost consciousness for death to occur. Dr. Garber was unable to identify the exact time of death, but from the facts taken from the coroner's investigation report, he opined with some degree of acceptance within the medical community the time of death was probably between midnight on June 7 and 8:00 a.m. on June 8.[5]

**Petition for resentencing**

Defendant's trial was in 2004, when the law allowed an accomplice to a killing during an inherently dangerous felony, an

---

[5] Servin's neighbor heard kicking noises and a complaining sound, coming from the shed between 6:00 and 6:30 a.m. on June 8. The police responded after her 6:00 a.m. call, suggesting Trejo probably was strangled just before he was brought outside wrapped in a blanket.

aider and abettor of robbery, to be convicted of murder without a showing of intent to kill or implied malice. (*People v. Strong* (2022) 13 Cal.5th 698, 704, 707-708 (*Strong*).) Effective January 1, 2019, the Legislature amended the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Section 1172.6 provides a procedure for those convicted of murder or attempted murder to seek retroactive relief if they could not now be convicted under section 188 or 189. (§ 1172.6, subd. (a); *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

In September 2019, defendant filed his petition for vacatur of his murder conviction and for resentencing under section 1172.6. The trial court appointed counsel for defendant. The prosecutor filed a response and defendant filed a reply along with the complete record on appeal in *People v. Cisneros, supra*, B179596. The trial court issued an order to show cause pursuant to section 1172.6, subdivision (c) and set a date for an evidentiary hearing.

The evidentiary hearing was held on September 7, 2022. The trial court stated it had read all writings the parties had put before the court. Neither the prosecutor nor defense counsel submitted any additional evidence. Following argument the court found the prosecution had met its burden to show beyond a reasonable doubt that defendant is guilty of murder under two remaining viable theories of murder: as a direct aider and abettor and as a major participant in the murder who acted with reckless

12

indifference to human life.  The trial court then denied the petition.

Defendant filed a timely notice of appeal from the order of denial.

## DISCUSSION

Defendant contends substantial evidence does not support the trial court's finding he was a major participant in an underlying felony who acted with reckless indifference to human life or that he aided and abetted the murder with intent to kill.

## I.    Standard of review

At the section 1172.6, subdivision (d)(3) evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, . . . that the petitioner is ineligible for resentencing."  (See *id.*, subd. (c).)  The trial court sits as an independent fact finder (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951) and must "'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard.'"  (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298).  On appeal from the denial of a petition after hearing, our task is to determine whether any rational trier of fact could have made the same determination beyond a reasonable doubt.  (*People v. Vargas, supra*, at p. 951.)

We apply the substantial evidence standard of review (see *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233-234), which "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*People v. Jones* (1990) 51 Cal.3d 294, 314).  We defer to

13

the trial court's resolution of conflicts and credibility determinations. (*People v. Clements, supra*, 75 Cal.App.5th at p. 298.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; 'a mere possibility' or '[s]peculation is not substantial evidence [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 120.) "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II.    Aiding and abetting

Following the change in law, felony murder remains a valid theory "if, 'with the intent to kill,' [the defendant] aids or abets 'the actual killer in the commission of murder in the first degree' ([§ 189,] subd. (e)(2)); or, if he was a 'major participant in the underlying felony' and 'acted with reckless indifference to human life' (*id*., subd. (e)(3))." (*People v. Wilson* (2023) 14 Cal.5th 839, 873.) First degree felony murder is murder perpetrated by means of enumerated felonies (for example, torture or robbery). (See § 189, subd. (a).)

Direct aiding and abetting also remains a valid theory of murder. (See *In re Lopez* (2023) 14 Cal.5th 562, 587.) "[F]or a defendant to be liable for first degree murder as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'" (*Ibid.*) Moreover, "'[a]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder.'" (*Id.* at p. 588.)

## III. Intent to kill

The People assert the trial court could have found defendant was ineligible for resentencing as a matter of law, and because the jury found the murder to be in the first degree and the torture-murder special circumstance true, we can affirm. Pointing out the jury was instructed that in order to find the torture-murder special circumstance true for an aider and abettor, the jury was required to find defendant harbored an intent to kill. The People conclude that the jury found beyond a reasonable doubt defendant harbored an intent to kill. Defendant counters that the instructions given did not require the jury to find defendant harbored an intent to kill, but only that the actual perpetrator intended to kill.

The jury was given CALJIC No. 8.81.18, as follows:

"To find that the special circumstance referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved: [¶] 1. The murder was

15

intential; and [¶] 2. A defendant intended to inflict extreme, cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose; and [¶] Awareness of pain is not a necessary element of torture."

The People argue the jury necessarily found defendant harbored an intent to kill, as instructed in the following relevant language of CALJIC No. 8.80.1:

"If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery which resulted in the death of a human being, namely Miguel Trejo."

The instruction contained no requirement an aider and abettor acted with express malice, so long as he acted with reckless indifference to human life and as a major participant. We thus cannot agree the special circumstance finding establishes as a matter of law that defendant harbored an intent to kill. Nor does it establish as a matter of law that defendant acted with reckless indifference to human life and as a major participant, because, since defendant's conviction, the California Supreme Court has "substantially clarified the law surrounding

16

major participant findings," as well as "the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 721; see *id.* at p. 720.)

We first turn to the evidence of intent to kill. To be guilty of murder, "'the aider and abettor must *know* and *share* the murderous intent of the actual perpetrator.'" (*In re Lopez, supra*, 14 Cal.5th at p. 585, italics added, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) "'[I]t is well settled that intent to kill or express malice . . . may . . . be inferred from the defendant's acts and the circumstances of the crime.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.'" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

After receiving a phone call on June 7, 2003, defendant, Altamirano, Hernandez and Trejo traveled to Servin's house, arriving about 11:00 p.m. Trejo, Hernandez and defendant immediately went into the shed moments before Altamirano heard sounds of punching, screaming, moaning, and duct tape being pulled from the roll, then a gunshot coming from the shed. After Altamirano was arrested defendant asked Altamirano to lie and tell police defendant had been forced to go into the shed. Attempting to hide one's involvement in a crime by false and misleading statements gives rise to an inference of consciousness of guilt. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1027.) Other such evidence was supplied by defendant's flight to the neighbor's house, apparently seeking refuge, when police arrived. Evidence of flight following the commission of a crime is relevant to show

17

consciousness of guilt. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054–1055.)

When analyzing the issue of reckless indifference by a major participant, the trial court reasonably inferred from the evidence defendant helped in the "delivery" of Trejo to the shed, knowing what was intended to happen there. Defendant contends his act of picking up Hernandez after Hernandez called him shows no more than they were friends, and friends sometimes give rides to each other. Our task is to determine whether substantial evidence supports the trial court's finding of intent to kill, not whether substantial evidence supports a contrary finding, as defendant suggests. (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759.) We must accept the logical inferences drawn or which could have been drawn by the trier of fact. (See *People v. Maury* (2003) 30 Cal.4th 342, 396.) Given that the beating of Trejo began shortly after his arrival and the shooting followed soon thereafter, it is clear defendant was not just being friendly but was aware that the purpose of helping Hernandez bring Trejo to the shed was to beat him.

Defendant suggests since no evidence shows he was present in the shed *during* the strangulation, there is no way of finding intent to kill. He cites no authority for that assertion. We find no authority that suggests an aider and abettor cannot be found to have shared the perpetrator's intent to kill unless he was actually present at the time of the final act causing death.

Defendant also contends proof of intent to kill is lacking because there was no evidence defendant ever personally participated in the beating of Trejo and no evidence he participated in the events in Gomez's apartment. However, the evidence does show defendant was in the shed during the initial

18

beating and gunshot and that he continued to go in and out during the night. On one occasion when defendant came out of the shed he told Altamirano they were "giving it to him" and invited Altamirano to hit Trejo, who defendant described as a "jacker" who had stolen drugs. The trier of fact could reasonably infer from defendant's invitation to Altamirano to participate, coming right after defendant emerged from the shed, that he knew Trejo was being beaten and why, and had already participated in beating Trejo while sharing his codefendants' motive for doing so.

Defendant was convicted of torture under section 206: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture."[6] At trial the jury was instructed with CALJIC No. 3.01, as follows: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime."

Defendant facilitated the torture of Trejo by participating in the delivery of him to the scene, participating in his beating, returning to the shed several times while the torture continued, and inviting Altamirano to participate. While defendant stood by, Trejo's torturers punched and shot him with a bullet that

---

[6] "'[G]reat bodily injury' means a significant or substantial physical injury." (§ 12022.7, subd. (f).)

19

went through his shin bone. Defendant continued to periodically go into the shed as Trejo obviously suffered and bled from his wounds. The torture of Trejo began about 11:00 p.m. on June 7 after defendant helped deliver him to the shed and continued through the night until after 6:00 a.m., when Montano heard kicking and complaining sounds.

A logical conclusion from this evidence is defendant knew the force used by the perpetrators would likely kill Trejo. He knew of at least one firearm. Defendant certainly knew during the drive to Servin's home after the second trip to Gomez's apartment that Hernandez intended to kill Trejo, when Hernandez called Servin and asked, "Is he still alive?" Hernandez's angry look and comment he was going to finish him off made that point clearly. Once at Servin's house, defendant and the others got out of the van near defendant's parked Lexus and went into the backyard. Even if defendant did not go into the shed, he knew Hernandez intended to kill Trejo, and defendant made no effort to leave or try to leave the scene.

From all the circumstances of the night of June 7 to the morning of June 8, we conclude substantial evidence supports a finding defendant knew of and shared the actual killer's intent to kill Trejo. We find the trial court's conclusion defendant was guilty of murder as a direct aider and abettor beyond a reasonable doubt to be amply supported by the evidence.

## IV. Major participant and reckless indifference

The trial court also found the same evidence showed defendant was guilty of felony murder as a major participant who acted with reckless indifference human life.

The trial court analyzed the evidence under the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People*

*v. Clark* (2016) 63 Cal.4th 522 (*Clark*), in which the California Supreme Court "substantially clarified the law surrounding major participant findings," and "then substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life" (*Strong, supra*, 13 Cal.5th at p. 721; see *id.* at p. 720).[7] "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks, supra*, at p. 803); what matters is the totality of the considerations (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*)).

Assuming we had not found substantial evidence to support the trial court's finding defendant shared a codefendant's intent to kill, it remains that most of the evidence discussed above in relation to express malice applies to several of the factors suggested in *Banks* and *Clark* necessary to determine whether defendant was a major participant. Those factors include defendant's role in planning the crime that led to the victim's death, defendant's awareness of the particular dangers posed by the nature of the crime and the weapons used, defendant's presence at the scene of the killing, whether he had the opportunity to prevent the murder, and what defendant's action was after lethal force was used. (*Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803; see *Scoggins, supra*, 9 Cal.5th at p. 677.)

As *Banks* explained, reckless indifference to human life means engaging in a felony known to carry a grave risk of death

---

[7] The reckless indifference requirement was first articulated in *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782 in relation to the imposition of the death penalty.

while "''*subjectively* aware that his or her participation in the felony involved a grave risk of death.'''" (*Banks, supra*, 61 Cal.4th at pp. 801, 807.) The factors indicating subjective awareness significantly overlap with the major participant factors. (*Clark, supra*, 63 Cal.4th at p. 615.) Thus, in addition to the major participant considerations mentioned above, factors include the long duration of the interaction between the perpetrators of the felony and the victim and any efforts defendant made to minimize the risks of violence during the crime. (See *Scoggins, supra*, 9 Cal.5th at p. 677, citing *Clark, supra*, 63 Cal.4th at pp. 618-623.)

As to planning, defendant, as directed, helped deliver Trejo to the shed around 11:00 p.m., and later asked Altamirano to falsely report defendant was forced into the shed. Evidence of punching noises and screaming, followed by a gunshot was presented. This supports a reasonable inference defendant was aware a violent crime was planned when he brought Trejo to the scene and was thus aware of the dangers posed by the crime. Defendant knew hours before Trejo died that a gun had been used in the attack. Defendant's car was parked outside Servin's house, but instead of using it to summon help for Trejo or otherwise attempt to minimize the risk of violence, defendant did nothing other than to invite Altamirano to participate in the beating. Throughout the night defendant made no effort to prevent further life-endangering conduct and continued to facilitate his codefendants' crimes. The sounds of kicking and a complaining sound described as "mm, mm" heard by Servin's neighbor after 6:00 a.m. suggests Trejo was still alive and being strangled at the time. Defendant was then standing outside the shed, close enough to restrain the killing, as it would likely have

taken Trejo several minutes to lose consciousness and another several minutes to die. Defendant was certainly aware of the danger to Trejo posed by defendant's cohorts over a period of approximately seven hours, and yet he made no effort to minimize that danger.

Quoting *Scoggins, supra*, 9 Cal.5th at page 677, defendant argues evidence of some factors, as well as absence of evidence of other factors, favored a finding that his actions did not involve the """gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant]'s situation"""" required for a finding of reckless indifference. Defendant notes the court found no evidence that defendant had or used a gun. He asserts there was no evidence he knew Salmon had a gun when Trejo was shot in the leg or that defendant had anything to do with any murder weapon. Defendant also claims there is insufficient evidence to show he was present while Trejo was strangled to death.

Defendant observes other people involved have explained they did not help Trejo because they were afraid of retribution.[8] He now suggests he could do nothing, as well. Apparently he suggests, because he was under no obligation to risk his life to try to save someone else's life, the fact he did nothing to attempt to minimize the violence or the risk to Trejo's life should not be considered. In other words, drawing his own favorable inferences from some evidence and from the absence of evidence, defendant concludes this seven-hour ordeal was "Hernandez's personal

---

[8] Defendant is apparently referring to Altamirano and Valdez.

23

vendetta against Trejo with [defendant] being caught in the wrong place at the wrong time with little recourse."

"Reckless indifference to human life is '*implicit* in knowingly engaging in criminal activities known to carry a grave risk of death.' (*Tison, supra*, 481 U.S. at p. 157.) Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' (*Ibid*.) Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' (*Clark*, *supra*, 63 Cal.4th at p. 617.)" (*Scoggins, supra*, 9 Cal.5th at pp. 676-677, italics added.) Defendant was in and out of the shed and aware of the gunshot wound and beatings the jury found to be torture. Defendant was an active participant for seven hours in the criminal activities which involved the torture, robbery and finally the murder of Trejo.[9] There is sufficient evidence that defendant's actions involved a ""gross deviation from the standard of conduct that a law-abiding person would

_____

[9]    Defendant complains the trial court never addressed the evidence of the underlying felony, robbery. He concludes he was not a major participant in the robbery because there was "no evidence" defendant had anything to do with taking Trejo's property. The jury found defendant guilty of the second degree robbery of Trejo beyond a reasonable doubt. As defendant has not included a separate argument challenging the jury's robbery verdict, his claim is not sufficiently developed to be cognizable on appeal. Therefore it will not be addressed. (See *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19.)

24

observe in the [defendant]'s situation."'" (*Scoggins, supra*, 9 Cal.5th at p. 677.)

We find sufficient evidence supports the trial court's alternative finding that defendant was a major participant in the underlying crimes and that he acted with reckless disregard for human life, and could thus still be convicted of murder today. (See *People v. Wilson, supra*, 14 Cal.5th at pp. 873-875.)

## DISPOSITION

The order denying the section1172.6 petition is affirmed.

_____
CHAVEZ, J.

We concur:


_____
ASHMANN-GERST, Acting P. J.


_____
HOFFSTADT, J.

25